UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

REPORT AND RECOMMENDATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Timothy C. Vossen,

    Plaintiff,

vs.

Michael J. Astrue, Commissioner
of Social Security,

    Defendant.     Civ. No. 07-1567 (PAM/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I.  Introduction

The Plaintiff commenced this action, pursuant to Section 205(g) of the Social

Security Act, Title 42 U.S.C. §405(g), seeking a judicial review of the

Commissioner's final decision which denied his application for Disability Insurance

Benefits ("DIB").  The matters is now before the Court upon the parties' cross-

Motions for Summary Judgment.  The Plaintiff has appeared by Charles E. Binder,

Esq., and the Defendant has appeared by Lonnie F. Bryan, Assistant United States

Attorney.  For reasons which follow, we recommend that the Plaintiff's Motion for

Summary Judgment be denied, and that the Defendant's Motion for Summary Judgment be granted.

## II. Factual and Procedural Background.

The Plaintiff first applied for DIB, on September 5, 2002, alleging that he had been disabled since July 1, 2002. [T. 28]. The Plaintiff met the insured status requirements at the alleged onset date of disability, and he remained insured for DIB through December 31, 2007. [T. 17].

On November 18, 2002, the State Agency denied his application. [T. 28-29, 35-39]. On May 27, 2003, the Plaintiff filed another application for DIB, but the State Agency denied his application upon initial review, and upon reconsideration. [T. 30-31, 42-48]. The Plaintiff timely requested a Hearing before an Administrative Law Judge ("ALJ") and, on June 2, 2005, a Hearing was conducted, at which time, the Plaintiff appeared personally and by counsel. [T. 356-86]. Thereafter, on January 3, 2006, the ALJ issued a decision denying the Plaintiff's claim for benefits. [T. 15-25]. On January 25, 2007, the Appeals Council denied the Plaintiff's request for review. [T. 6-8]. Thereafter, on March 19, 2007, the Plaintiff commenced this action. See, Docket No. 1.

- 2 -

On August 7, 2007, the parties filed a stipulation for a remand pursuant to sentence-six, Title 42 U.S.C. §405(g), see, Docket No. 9, and on August 17, 2007, an Order for Remand was issued to the Commissioner of Social Security for further administrative proceedings, see, Docket No. 10., because certain evidence, which had been submitted to the Appeals Council prior to its decision, had not been included in the Administrative Record. [T. 387]. On December 28, 2007, after reviewing the additional evidence, the Appeals Council confirmed its earlier decision, thereby affirming the ALJ's decision. Id. Thus, the ALJ's determination became the final decision of the Commissioner. See, Mackey v. Shalala, 47 F.3d 951, 953 (8th Cir. 1995); Greenstreet v. Astrue, 2008 WL 1733119 at *2 (D. Minn., April 10, 2008); Gunter v. Richardson, 335 F. Supp. 907, 909 (D. Ark. 1972); Title 20 C.F.R. §404.981.

By an Order dated January 11, 2008, the District Court, the Honorable Paul A. Magnuson presiding, reopened this action, upon the Motion of the Commissioner. See, Docket Nos. 12, 16.

### III.   Administrative Record

A.   Factual Background.  The Plaintiff was thirty-eight (38) years old on the date of the Hearing. [T. 24]. The Plaintiff completed the twelfth grade, but did not

graduate from high school, and he has past relevant work experience in swimming pool construction, delivery, and as a maintenance worker.  [T. 97, 112, 360].  The Plaintiff alleges that he has been had been unable to work since 2002, due to ruptured discs, a lumbar spine impairment, severe back pain, and arthritis.  [T. 113, 124].

      1.    <u>Medical Records.</u>  On July 9, 2002, the Plaintiff was involved in a motor vehicle accident, and was admitted to St. Francis Regional Medical Center, in Shakopee, Minnesota.  [T. 162].  At the time of his admission, the Plaintiff complained of lower back and neck pain.  [T. 162, 169].  On July 10, 2002, the Plaintiff went to the Crossroads Clinic, in Chaska, Minnesota, where he was examined by Joseph Kandiko, M.D. ("Dr. Kandiko").  [T. 177].  Dr. Kandiko observed that the Plaintiff was experiencing some lower back discomfort, but had a full range of motion in his back.  [T. 177].  On July 15, 2002, the Plaintiff was re-examined by Dr. Kandiko.  <u>Id.</u>  The Plaintiff was still very stiff and had limited range of motion in his neck, as well as difficulty in bending at the waist.  <u>Id.</u>  The Plaintiff also had discomfort in his middle to lower back.  <u>Id.</u>  Dr. Kandiko told the Plaintiff not to work

- 4 -

for at least one (1) week, and he prescribed physical therapy.  Id.  Dr. Kandiko also continued the Plaintiff's prescription for Vicodin.[1]  Id.

On that same date, the Plaintiff had his first physical therapy visit with Marcy Schulz, P.T. ("Schulz").  [T. 192].  The Plaintiff had muscle spasms, tenderness in his middle to lower back, and difficulty bending due to pain.  Id.  On July 17, 2002, the Plaintiff had another physical therapy session, in which he was unable to bend or squat, and was very uncomfortable lying on his back.  [T. 189].  On July 19, 2002, the Plaintiff was again examined by Schulz.  [T. 188].  The Plaintiff complained of "popping" in his back, and he had difficulty turning his upper body.  Id.  On July 23, 2002, the Plaintiff told Schulz that he was still experiencing  "popping" in his lower back, but that his neck muscles were not as tight.  [T. 187].

On that same date, the Plaintiff was examined by Dr. Kandiko.  [T. 174].  Dr. Kandiko reported that the Plaintiff could flex to about forty-five (45) degrees, and his back spasms were subsiding.  [T. 174].  Dr. Kandiko allowed the Plaintiff to return to work on July 29, 2002, for approximately four (4) hours a day, with restrictions on bending, stooping, and lifting.  Id.

---

[1]Vicodin is "indicated for the relief of moderate to moderately severe pain." Physician's Desk Reference, at 510 (62nd ed. 2008).

On July 25, 2002, the Plaintiff had another physical therapy session, where he complained of "popping" in his back, and radiating pain around his chest.  [T. 186]. On July 30, 2002, the Plaintiff was examined by Dr. Kandiko.  [T. 174].  Dr. Kandiko noted that the Plaintiff had a full range of motion in his back, was able to walk without difficulty, and his back strain was resolving.  Id.  The Plaintiff still had some "popping" in his back, when he stood up straight or twisted, but he was allowed to return to full work days on August 5, 2002.  Id.  On that same date, the Plaintiff had his last physical therapy session with Schulz.  [T. 185].  The Plaintiff still had "popping" in his back,  and he had difficulty controlling his position, but his  range of motion was within normal limits for his neck and trunk area, and he reported that his pain was slowly decreasing.  [T. 184-85].

On August 7, 2002, the Plaintiff had his back x-rayed.  [T. 215].  David A. Copp, D.C. ("Dr. Copp"), found misalignments in some of the Plaintiff's vertebrae, and his neck exhibited the loss of normal curvature.  Id.  On August 8, 2002, the Plaintiff was examined by Theodore Groskreutz, M.D. ("Dr. Groskreutz").  [T.173]. The Plaintiff reported difficulty moving, and he had pain in his neck, upper and lower back, and groin. Id.  The Plaintiff had returned to work, but he had only been on light

duty. Id. Dr. Groskreutz prescribed ice, rest, Cyclobenzaprine, and Vicodin, and he directed the Plaintiff not to work until August 14, 2002.[2] Id.

On August 13, 2002, the Plaintiff was examined by Dr. Kandiko. Id. The Plaintiff was still experiencing "popping" in his back, but he had full range of motion, and he experienced only minor discomfort with lateral motion bilaterally. Id. Dr. Kandiko concluded that the Plaintiff's back strain was stable, and the Plaintiff was set to return to work on August 19, 2002. Id.

On August 16, 2002, the Plaintiff returned to Dr. Kandiko, and complained of discomfort in his lower back. Id. The Plaintiff walked stiffly, and his lower back muscles were tender, but he also had a full range of motion in his back. Id. Dr. Kandiko ruled out a herniated disc, and ordered an Magnetic Resonance Imaging ("MRI"). Id.

On August 22, 2002, the Plaintiff was administered a cortisone shot. [T. 172]. On August 26, 2002, the Plaintiff told Dr. Kandiko that he felt minimal relief from the cortisone shot, that he felt tender in his chest wall and middle back, and that he was experiencing persistent back spasms. Id. Dr. Kandiko approved of the Plaintiff

---

[2]Cyclobenzaprine hydrochloride "is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute, painful musculoskeletal conditions." Physician's Desk Reference, at 3464-65 (62nd ed. 2008).

seeing a chiropractor, and instructed him to remain off work until September 4, 2002.
Id.

On August 27, 2002, the Plaintiff went to the Jordan Medical Clinic, in Jordan, Minnesota, and was examined by Dr. Copp.  [T. 205].  Dr. Copp noted that the Plaintiff suffered from a reduced range of motion, and from muscle spasms.  Id.  The Plaintiff also complained of pain and stiffness in his middle and lower back, and pain radiating into his chest and legs.  Id.  The Plaintiff reported that his pain made it difficult for him to sleep, and that his symptoms were aggravated by standing, bending, walking, and reaching.  Id.  Dr. Copp recommended a treatment regime that included chiropractic manual adjusting, physical therapies, and exercise training.  Id.  Dr. Copp also ordered various physical, and work restrictions, on heavy lifting, repetitive bending, lifting, or twisting.   Id.  From August to October of 2002, the Plaintiff was seen regularly by Dr. Copp for chiropractic treatment, so as to alleviate the pain and stiffness in his neck, back, and right knee.  [T. 213-14].

On September 9, 2002, at the request of Dr. Copp, the Plaintiff was examined at the Pain Assessment and Rehabilitation Center, in Edina, Minnesota, by Alfred V. Anderson, M.D. ("Dr. Anderson").  [T. 290].  Dr. Anderson found that the Plaintiff experienced pain in his middle and lower back, reduced movement in his neck, muscle

spasms in his neck and upper back, and difficulty raising his arms above his head.  Id.

Dr. Anderson concluded that the Plaintiff was suffering from a back strain, disc

derangement, migraine headaches, a possible rib injury, and depression secondary to

the Plaintiff's ongoing pain and loss of function. [T. 291].  Dr. Anderson reported that

an MRI showed a compression of the Plaintiff's spinal cord in his middle back, but

there was no evidence of any direct nerve compression.  Id.  Dr. Anderson prescribed

a Medrol Dosepak, and Vicodin, gave him samples of Vioxx, and Zanaflex, and

directed the Plaintiff to walk daily.[3]  Id.

On September 16, 2002, the Plaintiff was examined by Dr. Anderson.  [T. 288].

The Plaintiff reported continued pain in his middle to lower back, and headaches, but

stated that his prescription medications, except for the Medrol Dosepak, worked well

during their effective duration.  Id.  The Plaintiff still exhibited a reduced range of

motion in his neck and back, and movement of his back produced radiating pain into

---

[3]Medrol is a trademark for preparations of methylprednisolone.  See, Dorland's
Illustrated Medical Dictionary, at 1137 (31st Ed. 2007).  Methylprednisolone is used
"in replacement therapy for adrenocortical insufficiency and as an antiinflammatory
and immunosuppressant[.]" Id. at 1171.  Vioxx is indicated for the relief of the signs
and symptoms of osteoarthritis and rheumatoid arthritis in adults.  See, Physicians'
Desk Reference, at 2122 (57th Ed. 2003).  Zanaflex is used for "the management of
spasticity."  Physicians' Desk Reference, at 644 (54th Ed. 2000).

his chest.  Id.  Dr. Anderson continued the Plaintiff's prescription of Vicodin, and provided more samples of Vioxx, and Zanaflex.  Id.

On September 30, 2002, the Plaintiff returned to Dr. Anderson, showing general improvement in his neck and middle and lower back, but he complained of a sharp stabbing pain when he sneezed. [T. 287].  Upon examination, Dr. Anderson noted that the Plaintiff had pain in his middle and lower back, limited motion in his neck and lower back, and pressure on his chest that produced substantial pain in his ribs.  Id.  The Plaintiff told Dr. Anderson that he had been taking Vioxx, Skelaxin, and Vicodin.[4]  Id.  He also reported an overall decrease in his pain, but any increase in activity produced "breakthrough pain."  Id.  Dr. Anderson renewed the Plaintiff's prescription for Vioxx, and he instructed the Plaintiff on the proper use of Vicodin, because the Plaintiff had been taking a lower dosage than prescribed.  Id.

On October 7, 2002, Dr. Copp sent a letter to the State Agency, advising them that the Plaintiff had been disabled from gainful employment since July 9, 2002, owing to his physical injuries, and that he was unlikely to return to his former work because of its physical demands.  [T. 204].

---

[4]Skelaxin is "indicated as an adjunct to rest, physical therapy, and other measures for the relief of discomforts associated with acute, painful musculoskeletal conditions."  Physician's Desk Reference, at 1753 (62nd Ed. 2008).

On October 14, 2002, the Plaintiff was examined by Dr. Anderson. [T. 285]. The Plaintiff reported that he was doing better, but he noted that he continued to have neck and middle and lower back pain, which he described as a squeezing sensation. Id. Dr. Anderson noted that the Plaintiff had muscle pain and spasms in his middle back, and a limited range of motion in his back and neck. Id. Dr. Anderson also refilled the Plaintiff's prescriptions. Id.

On November 5, 2002, the Plaintiff was seen by Dr. Anderson. [T. 284]. The Plaintiff reported that his overall pain intensity was better, and that he no longer experienced radiating pain in his chest. Id. Although the Plaintiff's range of motion was limited in his neck and back, he had reduced his use of medication, and had started a stretching and walking routine, and he was able to do some light yard work. Id. After seeing the Plaintiff's improvement, Dr. Anderson decided not to renew the Plaintiff's prescriptions. Id.

On December 12, 2002, the Plaintiff was seen by Dr. Anderson for a regular checkup. [T. 282]. During that visit, he reported a numbing, burning sensation in his right leg, and cramping in his upper right leg and right foot, which made it difficult for him to walk. Id. He also reported difficulty sitting, standing, or walking, for prolonged periods of time. Id. The Plaintiff had resumed taking his medications, but

continued to have back spasms, and the pain from his middle back radiated to the front of his abdomen.  Id.  Dr. Anderson referred the Plaintiff to David Holte, M.D. ("Dr. Holte"), who is an Orthopedic Spine Surgeon, for an opinion about potential surgical intervention.  [T. 283].

On January 7, 2003, the Plaintiff was examined at Orthopaedic Consults, P.A., in Edina, Minnesota, by Dr. Holte.  [T. 224].  During the examination, Dr. Holte observed that bending and rotation tests produced pain or soreness in the Plaintiff's back.  [T. 222-23].  Although Dr. Holte was unable to review the Plaintiff's MRI scans, he did review the MRI reports, and he concluded that the Plaintiff suffered from a neck strain, and multiple disc herniations.  [T. 222].  Dr. Holte recommended that the Plaintiff begin an exercise program, and receive an epidural steroid injection.  Id. Dr. Holte reported that, if the Plaintiff did not make significant improvements within the next four (4) to eight (8) weeks, he would recommend a new MRI scan of the Plaintiff's lumbar spine.  [T. 221].

On January 15, 2003, Dr. Holte injected the Plaintiff 's back with lidocaine and betaemethasone.[5]  [T. 226].  Approximately thirty (30) minutes after the injection, the

---

[5] Lidocaine is a "drug having anesthetic, sedative, analgesic, anticonvulsant, and cardiac depressant activites, used as a local anesthetic[.]"  Dorland's Illustrated Medical Dictionary, at 1048 (31st Ed. 2007).  Betamethasone is "a synthetic

Plaintiff reported a forty (40) percent improvement in his pain symptoms.  Id.  On

February 13, 2003, the Plaintiff had a followup with Dr. Holte, and he reported that

he felt seventy-five (75) percent worse than his previous visit.  [T. 220].  He also

reported that the epidural injection had provided relief for approximately three (3)

weeks, but that his pain had worsened in the past week.  Id.  He felt a weakness in his

legs, and pain in his low back, buttocks, and groin, and the pain in his middle back

radiated into his chest.  Id.

On February 11, 2003, the Plaintiff had a followup visit with Dr. Anderson.  [T.

276].  He complained of pain in his neck and back, and also described sternal pain

when he held his arms out in front of him.  Id.  The Plaintiff was still unable to return

to work, and any increase in activity exacerbated his condition.  Id.  Dr. Anderson

noted that the Plaintiff was moderately depressed.  [T. 278, 280].  Dr. Anderson

prescribed Percocet and a Medrol Dospak, and he provided Zanaflex samples.[6]  [T.

281].

---

glucocorticoid * * * used as an antiinflammatory."  Id. at  214.

[6]Percocet is "indicated for the relief of moderate to moderately severe pain."
Physician's Desk Reference, at 1126 (62nd ed. 2008).

On March 17, 2003, during a visit with Dr. Anderson, the Plaintiff was still suffering from neck and back pain and, for approximately two (2) weeks, he had felt a numbness in his legs, and groin pain.  [T. 270].  He had stopped taking Percocet because of its cognitive side effects, but was still using Vicodin and Vioxx.  [T. 271].  Dr. Anderson noted that the Plaintiff was still moderately depressed, and he wrote him a prescription for Norco.[7]   [T. 272, 294].  On April 1, 2003, the Plaintiff described pain across the middle of his back, which radiated to the top of his right leg.  [T. 267].  He was also experiencing muscle spasms in his upper back but, during his neurological examination, he was able to toe walk and heel walk.  [T. 267-68].  The following day -- on April 2, 2003 -- Dr. Anderson sent a letter to the Plaintiff's counsel recommending that the Plaintiff be referred for a functional capacities evaluation.  [T. 266].

On April 17, 2003, the Plaintiff was examined by Dr. Holte.  [T. 219].  Dr. Holte noted that the Plaintiff had difficulty bending  down and twisting.  [T. 219].  The Plaintiff reported that his symptoms were split evenly between his middle back,

---

[7]Norco contains hydrocodone bitartrate.  See, Physician's Desk Reference, at 3336 (62nd Ed. 2008).  Hydrocodone bitartrate is "a semisynthetic derivative of codeine used as an antitussive[.]"  Dorland's Illustrated Medical Dictionary, at 890 (31st Ed. 2007).

low back, and right leg.  Id.  Dr. Holte recommended that the Plaintiff obtain a new MRI scan, because his previous MRI was eight (8) months old.  Id.  On April 18, 2003, the Plaintiff had a new MRI scan performed.  [T. 225].  Thomas J. Gilbert, M.D., reviewed the Plaintiff's  MRI scan, and concluded that there was a mild disc bulging in the middle back, but no disc herniation.  [T. 218, 225].

On May 1, 2003, during a follow-up with Dr. Anderson, the Plaintiff still complained about pain in his  back, neck, and right leg.  [T. 260].  He also described muscle contracture headaches, and moderate depression.  [T. 260, 262].  On that same day, Dr. Anderson wrote a letter to the Plaintiff's counsel advising that the Plaintiff was unable to return to work, due to his injuries, and that there was "every clinical indication that this is a total and permanent condition."  [T. 258].

On May 10, 2003, Dr. Holte informed the Plaintiff  that, after examining the Plaintiff's MRI, he had only found a small disc bulge in the middle back.  [T. 217].  Dr. Holte did not find any disc herniation, and he concluded that the Plaintiff did not need surgery.  Id.

On May 7, 2003, Dr. Copp sent a letter to the State Agency advising that the Plaintiff had suffered a permanent spinal injury, as a result of his automobile accident,

- 15 -

and that his injuries required ongoing medical care, which made the Plaintiff unable to return to gainful employment.  [T. 203].

On June 18, 2003, the Plaintiff had a return checkup with Dr. Anderson, in which he reported that he had been out of medication for two (2) weeks and, as a result, he had experienced a major increase in his pain.  [T. 251].  He also felt depressed and fatigued, and reported that he was unable to do even small household chores without his medication.  [T. 253].  In addition to renewing the Plaintiff's prescriptions, Dr. Anderson prescribed Ambien.[8]  [T. 257].

On July 23, 2003, the Plaintiff had another follow-up visit with Dr. Anderson. [T. 244].  The Plaintiff still had pain in his back, neck, and head, as well as  moderate depression, but he was able to perform household chores, such as washing dishes and mowing the lawn, as long as someone started the lawn mower for him.  [T. 246].  Dr. Anderson provided the Plaintiff with samples of Bextra and wrote him a prescription for Inderal.[9]  [T. 249].

---

[8]Ambien is "indicated for the short-term treatment of insomnia."  Physician's Desk Reference, at 2799 (62nd Ed. 2008).

[9]Bextra is used "for relief of the signs and symptoms of osteoarthritis and adult rheumatoid arthritis * * * [and] the treatment of primary dysemnorrhea."  Physician's Desk Reference, at 2696 (59th Ed. 2005).  Inderal "is indicated for the prophylaxis of common migraine headache."  Physicians' Desk Reference, at 3405 (57th Ed. 2003).

On August 27, 2003, the Plaintiff was examined by Dr. Anderson.  [T. 241].

The Plaintiff reported pain in his middle and low back, and muscle spasms in his

upper back.   Id.   However, the Plaintiff reported that his headaches had been

nonexistent for a period of time.   Id.   Dr. Anderson injected lidocane and Depo-

Medrol into the Plaintiff's middle and lower back, which provided him some pain

relief.  [T. 242].  Dr. Anderson also wrote the Plaintiff a prescription for Roxicodone

and Vioxx.[10]   Id.   On September 3, and 8, 2003, the Plaintiff contacted Dr. Anderson

by phone, and reported that the Roxicodone was working very well, with only minor

side effects.  [T. 239-40].   On September 30, 2003, he contacted Dr. Anderson to

request an injection procedure, and Dr. Anderson ordered an epidural.  [T. 238].

On October 13, 2003, Dr. Anderson injected the Plaintiff in the middle of his

back with lidocaine and Depo-Medrol.  [T. 298].  Approximately thirty (30) minutes

after the procedure, the Plaintiff reported twenty (20) percent relief of his symptoms.

Id.  On October 28, 2003, Dr. Anderson examined the Plaintiff, who stated that, along

with his usual neck and back pain, his legs became numb when crossed, and he had

intermittent numbness in his left hand.  [T. 232].   Dr. Anderson prescribed the

---

[10]Roxicodone is a "trademark for preparation of oxycodone hydrochloride and acetaminophen."  Dorland's Illustrated Medical Dictionary, at 1681 (31st Ed. 2007). Oxycodone hydrochloride is used as a pain killer.  Id. at 1377.

Plaintiff a Duragesic patch, and Roxicodone, and he provided more samples of Bextra.[11]  [T. 237].

On March 18, 2004, the Plaintiff had a follow-up examination with Dr. Anderson.  [T. 318].  The Plaintiff's middle back pain had worsened, and he had difficulty standing up during the examination.  Id.  During a neurological exam, he had difficulty walking on his toes and heels, which Dr. Anderson attributed to the Plaintiff's back pain.  Id.  In his notes, Dr. Anderson observed that the Plaintiff was "totally disabled."  Id.

On April 13, 2004, during a visit with Dr. Anderson, the Plaintiff complained of his usual symptoms, and reported having difficulty with his depression and sleeping.  [T. 341].  His pain had also escalated, which the Plaintiff attributed to his medications being stolen, shortly after the prescription was filled.  Id.  Since his prescriptions could not be refilled due to theft, the Plaintiff received samples of Effexor and Ultracet.[12]  Id.  Dr. Anderson concluded that the Plaintiff's severe

---

[11]Duragesic is a "transdermal system," which is "indicated for management of **persistent,** moderate to severe chronic pain[.]" Physician's Desk Reference, at 2352-2353 (62nd Ed. 2008)[emphasis in original].

[12]Effexor is "indicated for the treatment of major depressive disorder." Physician's Desk Reference, at 3359 (62nd Ed. 2008).  Ultracet is "a centrally acting synthetic opioid analgesic," that is indicated for the short-term management of acute

depression was affecting his overall ability to function, and that the Plaintiff would remain unemployed for at least a year.  [T. 342].

On May 11, 2004, the Plaintiff returned to Dr. Anderson's office.  [T. 340]. The Plaintiff reported that he was depressed, and that his pain made it difficult for him to sleep.  Id.  Dr. Anderson prescribed Roxicodone, Gabitril, Effexor, and Bextra.[13] Id.  On June 8, 2004, during a follow-up with Dr. Anderson, the Plaintiff's pain had increased, and he reported that his current medications were ineffective.  [T. 338].  Dr. Anderson noted that the Plaintiff's back was visibly in spasm, and he had difficulty sitting in, or getting out of, a chair.  Id.

On July 6, 2004, the Plaintiff was examined by Dr. Anderson.  [T. 336].  The Plaintiff complained of left lower back pain that radiated into his left buttock.  Id.  He also had difficulty walking, and straightening up from a flexed position.  Id.  Dr. Anderson wrote the Plaintiff a prescription for Methadone.[14]  Id.  On July 15, 2004,

_____

pain.  Id. at 2462-63.

[13]Gabitril is "indicated as adjunctive therapy in adults and children 12 years and older in the treatment of partial seizures."  Physician's Desk Reference, at 966 (62nd Ed. 2008).

[14]Methadone hydrochloride possesses "pharmacologic actions similar to those of morphine and heroin," and is used "as an analgesic[.]"  Dorland's Illustrated Medical Dictionary, at 1163 (31st Ed. 2007).

the Plaintiff returned to Dr. Anderson with an increase in pain between his shoulder blades and down his spine.  [T. 334].  Dr. Anderson injected the Plaintiff at trigger point muscles, with lidocaine and Depo-Medrol, which reduced the Plaintiff's pain substantially.  [T. 334-35].  Dr. Anderson also placed Lidoderm patches over the treated area.[15]  [T. 334].  Since the Plaintiff reported that the Methadone did not work effectively, Dr. Anderson prescribed him hydrocodone and Roxicodone.[16]  Id.

On August 13, 2004, the Plaintiff was seen by Dr. Anderson.  [T. 332].  The Plaintiff reported pain in his lower back and buttocks.  Id.  His medications had increased his overall ability to function and sleep, but he had, without authorization, increased his intake of Norco to help him sleep.[17]  Id.  Dr. Anderson refilled the Plaintiff's prescription for Norco, and also prescribed Serzone.[18]  Id.  On August 31,

---

[15]Lidoderm "is indicated for relief of pain associated with post herpetic neuralgia."  Physician's Desk Reference, at 1114 (62nd Ed. 2008).

[16]Hydrocodone is a painkiller "derived from codeine but having more powerful sedative and analgesic effects."  Dorland's Illustrated Medical Dictionary, at 890 (31st Ed. 2007).

[17]Norco is used for "combination preparation of hydrocodone bitartrate and acetaminophen."  Dorland's Illustrated Medical Dictionary, at 1309 (31st Ed. 2007).  Hydrocodone bitartrate is used as a pain and cough reliever.  Id. at 890.

[18]Serzone is indicated for "the treatment of depression."  Physician's Desk Reference, at 850 (54th 2000).

2004, the Plaintiff reported his usual back and neck pain, but he noted increasing pain in his right knee.  [T. 331].  He also exhibited muscle spasms in his back, especially on the right side of his spine, as well as a loss of motion in the lower back.  Id.

On September 23, 2004, the Plaintiff had an MRI performed on his right knee at the Center for Diagnostic Imagining, in Edina, Minnesota.  [T. 296].  The MRI revealed  that his right knee had inflamation in the joint and cartilage, moderate joint effusion, and a chronic medial collateral ligament injury.[19]  [T. 297].

On October 26, 2004, the Plaintiff was examined by Dr. Anderson.  [T. 329]. The Plaintiff complained of pain in his back, neck, and right knee, and the range of motion in his lower back was also limited.  Id.  On November 23, 2004, the Plaintiff was seen by Dr. Anderson, after his arthroscopy surgery on his right knee.  [T. 325]. Dr. Anderson noted that the Plaintiff's spinal pain caused a pronounced loss of function in the right knee, but the Plaintiff reported that his right knee felt much better after surgery.  Id.  The Plaintiff was prescribed Roxicodine, Protonix, amoxicillin, and Ambien.[20]

---

[19]An effusion is "the escape of a fluid into a part of tissue[.]" Dorland's Illustrated Medical Dictionary, at 602 (31st Ed. 2007).

[20]Protonix is "indicated for the short-term treatment * * * in healing and symptomatic relief of erosive esophagitis." Physician's Desk Reference, at 3412 (62nd

On December 22, 2004, the Plaintiff was examined by Dr. Anderson.  [T. 321].
The Plaintiff reported that his neck and back pain were still at high levels, but his right
knee was feeling better.  Id.  After the examination, Dr. Anderson prescribed
Roxicodine and a Lidoderm patch.  [T. 324].  On December 26, 2004, David R. Olson,
M.D. ("Dr. Olson"), wrote Dr. Anderson a letter, advising that the Plaintiff's right
knee recovery was progressing with the help of physical therapy.  [T. 319].

On June 27, 2005, the Plaintiff had an MRI performed on his spine, which
revealed a slipped disc in his middle back, with mild cord flattening and disc disease
in the lower vertebrae of his neck, accompanied by a flattening of the ventral cord.
[T. 350].

2.   Assessments.  On November 14, 2002, the Plaintiff had a Residual
Functional Capacity ("RFC") Assessment that was conducted by Jeffrey Gorman,
M.D. ("Dr. Gorman").  [T. 195, 202].  Dr. Gorman concluded that the Plaintiff should
be able push or pull without limitation, occasionally lift fifty (50) pounds, frequently
lift twenty-five (25) pounds, and stand, walk, or sit, for six (6) hours out of an eight
(8) hour day.  [T. 196].  Dr. Gorman did not find that the Plaintiff would have any

---

Ed. 2008).  Amoxicillin is a product of Amoxil which is used "in the treatment of
infections[.]."  Id. at 1325.

other limitations.  [T. 197-99].  He also concluded that the Plaintiff's condition should have improved since his accident, but nonetheless, he found that the Plaintiff's condition was attributable to a medically determinable impairment, and that his pain was partially credible.  [T. 197-200].

On August 29, 2003, another RFC Assessment was conducted by Dan Larson, M.D. ("Dr. Larson").  [T. 300, 307].  Dr. Larson found that the Plaintiff could push or pull without limitation, occasionally lift fifty (50) pounds, frequently lift twenty five (25) pounds, and stand, walk, or sit, for six (6) hours out of an eight (8) hour day. [T. 301].  Dr. Larson also concluded that the Plaintiff would frequently be able to climb stairs, balance, kneel, crouch and crawl, but only occasionally stoop or climb a ladder, rope or scaffolds.  [T. 302].  Dr. Larson found that the Plaintiff's injuries were at least partially credible, and that the Plaintiff's pain reduced his RFC from non-severe to medium residual capacity.  [T. 305].

On March 4, 2005, the Plaintiff had an assessment conducted by A. Neil Johnson, M.D. ("Dr. Johnson").  [T. 308].  Dr. Johnson noted that the Plaintiff's chief complaints were ruptured discs in his back, pain in his right knee, and depression.  Id. In his report, Dr. Johnson found that the Plaintiff was depressed, that he had difficulty using stairs, and that he was unable to sleep, squat, or go up a ladder.  Id.  During his

examination, Dr. Johnson observed that the Plaintiff appeared to be in severe pain, walked with a small gait, and a moderate limp on his left side, and avoided putting weight on his swollen right knee. [T. 309]. Dr. Johnson noted that the Plaintiff had tenderness in his lower back, and pain in his neck, back, and right knee. Id. The Plaintiff also had moderate difficulty moving on and off the examination table, and severe difficulty walking heel to toe. Id.

Dr. Johnson concluded that the Plaintiff's right knee injury, and his back and neck pain, prevented the Plaintiff from any heavy lifting, or standing or walking for long periods of time. [T. 311]. He also concluded that the Plaintiff's depression was caused by his injuries, and his inability to work since his accident. Id. Dr. Johnson determined that the Plaintiff's limitations were occasionally lifting ten (10) pounds, frequently lifting less than ten (10) pounds, that the Plaintiff's standing, sitting, and walking, were impaired by his injuries, and that the Plaintiff's pushing or pulling was limited in the lower extremities. [T. 313-14]. The Plaintiff was limited to occasionally climbing, balancing, and reaching in all directions, and was never allowed to kneel, crouch, crawl, or stoop. Lastly, the Plaintiff could not be in environments which were either hazardous, or had vibrations. [T. 315-16]. Dr. Johnson also concluded that the Plaintiff was limited to less than two (2) hours of

- 24 -

standing or walking, and six (6) hours of sitting, in an eight (8) hour work day.  [T. 317].

        3.    <u>Evidence Presented to the Appeals Council</u>.    From September 23, 2004, to September 20, 2006, the Plaintiff was seen regularly by Dr. Copp for chiropractic treatment, in order to alleviate the pain and stiffness in his neck, back, and right knee.  [T. 390-92].

On November 17, 2004, David R. Olson, M.D. ("Dr. Olson"), from Orthopedic Medicine and Surgery, Ltd., performed arthoscopic surgery on the Plaintiff's right knee.  [T. 405].

On January 31, 2005, the Plaintiff was seen by Dr. Anderson.  [T. 418].  The Plaintiff reported problems in his middle and lower back, right hip, right knee, and right lower leg.  <u>Id.</u>  The Plaintiff had difficulty bending, had  muscle spasms in his upper back, and palpation produced pain in his middle and lower back.  <u>Id.</u>  Dr. Anderson also found the right knee swollen and tender to the touch.  <u>Id.</u>  Besides continuing the Plaintiff's prescriptions for Roxicodone and Lidoderm, Dr. Anderson provided the Plaintiff with samples of Protonix and Effexor.  [T. 418-19].

On February 7, 2005, during a visit with Dr. Olson, the Plaintiff reported that his physical therapy  was aggravating his right knee pain.  [T. 415].  Dr. Olson found

that the Plaintiff had synovitis, and effusion in the right knee, but he opted for anti-inflammatory medications instead of a cortisone injection.[21] Id. However, Dr. Olson noted that, if the Plaintiff continued to have problems, the right knee would need aspiration, and a cortisone injection. Id. On February 17, 2005, the Plaintiff had a follow-up visit with Dr. Olson. [T. 412]. The Plaintiff still had synovitis and effusion of the right knee and, as a result, Dr. Olson aspirated normal joint fluid from the right knee, and injected the knee with Decadron, Depo-Medrol and Marcaine.[22] Id.

On March 21, 2005, the Plaintiff was examined by Dr. Anderson at Medical Pain Management, in St. Louis Park, Minnesota. [T. 420]. The Plaintiff continued to have back, neck, and knee pain, as well as difficulty straightening up from a flexed position, and palpation produced pain in his middle and lower back. Id. However, he

---

[21]Synovitis is the "inflammation of a synovium." Dorland's Illustrated Medical Dictionary, at 1879 (31st Ed. 2007). The synovium is "composed of loose connective tissue and having a free smooth surface that lines the joint cavity." Id. at 1144.

[22] Decadron is a "trademark for preparations of dexamethasone." Dorland's Illustrated Medical Dictionary, at 481 (31st Ed. 2007). Dexamethasone is used "as an anti-inflammatory." Id. at 511. Marcaine is a "trademark for a preparation of bupivacaine hydrochloride." Id. at 1121. Bupivacaine hydrochloride is used as "a local anesthetic for local infiltration, peripheral nerve block, retrobulbar block, subarachnoid block, sympathetic block and caudal and epidural anesthesia." Id. at 265.

reported that his medications effectively managed his pain.  Id.  Dr. Anderson prescribed Effexor and Methadone.  [T. 421].

On April 28, 2005, Dr. Olson examined the Plaintiff, who complained that his right knee continued to cause him so much pain that he required a cane to walk for long periods of time.  [T. 410].  The Plaintiff also had a moderate to large effusion in his right knee.  Id.  Dr. Olson decided to refer the Plaintiff to John R. Kearns, M.D. ("Dr. Kearns"), for a second opinion.  Id.

On May 9, 2005, the Plaintiff had a follow-up with Dr. Anderson.  [T. 422]. The Plaintiff had difficulty standing up, swelling in his right knee, muscle spasms and pain in his lower back and neck, and the range of motion in his neck was limited.  Id. The Plaintiff's prescriptions were continued and he was provided samples of Celebrex.[23]

On July 18, 2005, the Plaintiff was seen, by Elmer R. Salovich, M.D. ("Dr. Salovich").  [T. 408].  Dr. Salovich observed that the Plaintiff's right knee had an effusion, and a reduced range of motion, and the knee's tenderness was difficult to localize due to swelling.  Id.  Dr. Salovich removed fluid from the Plaintiff's right

---

[23]Celebrex is "indicated for relief of the signs and symptoms of osteoarthritis, * * * rheumatoid arthritis in adults, * * * and for the management of acute pain in adults."  Physician's Desk Reference, at 3066 (62nd Ed. 2008).

knee, and injected it with Decadron, Depo-Medrol, and Marcaine. The Plaintiff was prescribed Vicodin, and was directed to see John R. Kearns, M.D. ("Dr. Kearns"), pursuant to Dr. Olson's earlier referral. Id.

On July 19, 2005, during a follow-up with Dr. Anderson, the Plaintiff complained of pain in his middle and lower back, right knee, and right groin. [T. 424]. During a straight leg raising test, the Plaintiff also experienced low back pain, and radiating pain into his groin. Id. Palpation produced pain in the lumbar spine muscles, especially on the right side. Id. Muscle spasms were also present in the upper back and neck muscles. Id. He also had difficulty getting out of a chair or getting up from a flexed position. Id.

On July 29, 2005, the Plaintiff was examined by Dr. Kearns, who noted that the Plaintiff continued to complain of pain in his right knee, especially during any weight-bearing activities. [T. 405]. The Plaintiff's right knee had limited motion from ten (10) to seventy-five (75) degrees, and strength testing was compromised because of the Plaintiff's knee pain. [T. 405-06]. An x-ray, which was taken of his right knee, revealed that his knees were aligned inward, and that there was a significant narrowing of the medial joint space which almost created bone to bone contact. [T. 406].

On October 11, 2005, the Plaintiff was examined by Illene T. Reed, M.D. ("Dr. Reed"), at the Jordan Medical Clinic.  [T. 394].  The Plaintiff stated that he was unable to see Dr. Anderson any longer, because Dr. Anderson had moved to a clinic that would not accept his medical insurance.  [T. 393].  Before his visit with Dr. Reed, the Plaintiff reported that another doctor had recommended cortisone injections, but the Plaintiff claimed that the cortisone had provided him pain relief for only five (5) days. Id.  Dr. Reed's examination found no tenderness on palpation of the midline spine, but palpation produced pain and muscle spasms in the middle and lower back.  [T. 393-94].  Dr. Reed also found fluid in the right knee, and noted that it was tender to palpation.  Id.  Since Dr. Reed did not specialize in long-term pain management with narcotics, the Plaintiff was referred to the Abbott Northwestern Chronic Pain Center. Id.

On October 24, 2005, the Plaintiff was examined by Dr. Anderson.  [T. 426]. The Plaintiff was on crutches because of recent surgery to the Plaintiff's right knee. Id.  As a result of the surgery, the Plaintiff had been unable to take his pain medications, which resulted in an increase in his overall pain.  Id.  Dr. Anderson found the Plaintiff's knee to be red and swollen, with a palpable increase in temperature.  Id. The Plaintiff also had spasms in the muscles surrounding his spine, and in his lower

back.  Id.  Since the Plaintiff had run out of medications, he was prescribed Roxicodone and Methadone.  Id.

On December 19, 2005, the Plaintiff had a visit with Dr. Anderson, in which he complained of pain in his right knee and lower back, that radiated down into his abdomen.  [T.428].  When Dr. Anderson examined the Plaintiff's right knee, he found it red and swollen.  Id.  The Plaintiff's right ankle also appeared to be swollen.  Id. The Plaintiff was able to place his fingertips three (3) inches above the knees, he had pain with lateral flexion, and muscle spasms were palpable in the left lower back and neck.  Id.

On July 31, 2006, Christopher M. Larson, M.D. ("Dr. Larson"), sent the Plaintiff's counsel a letter, advising that the Plaintiff suffered from medial compartment osteoarthritis in his knee.  [T. 396].  In an attempt to relieve his pain, the Plaintiff had his high tibia bone cut, but the failure of that procedure meant that he still suffered knee pain.  Id.  Dr. Larson averred that the Plaintiff would require a knee reconstruction procedure in order to relieve the Plaintiff's knee pain.  Id.

B.   Hearing Testimony.  The Hearing on June 2, 2005, commenced with some opening remarks by the ALJ, in which she noted the appearances of the parties for the Record.  [T. 358].  After the Plaintiff's counsel completed his short opening

- 30 -

remarks, the ALJ swore the Plaintiff to testify.  [T. 358-59].  The Plaintiff explained that, at the time of the Hearing, he lived with his wife and his son, and he testified that he had not completed high school. [T. 359-60].  The Plaintiff attested that he had been unable to work since July of 2002, because of pain in his leg, back, and neck.  [T. 360].  The Plaintiff also testified that he had constant muscle spasms in his middle and low back.  Id.  He further stated that even common tasks, such as sitting, produced the spasms.  [T. 361].

To alleviate his pain, the Plaintiff would lie down and elevate his legs on pillows.  Id.  The Plaintiff confirmed that medications had helped in the past, but since his past medications had been taken off the market, he had not taken any new medications because they upset his stomach.  Id.  He reported that his chiropractic treatment provided some pain relief, but heat and ice were generally ineffective.  Id. The Plaintiff attested that he had a total of two (2) injections performed on his back, but that they did not provide pain relief.  [T. 361-62].  The Plaintiff also testified that he had attempted some neck exercises, but he was unable to do other exercise because of pain.  [T. 362].  The Plaintiff confirmed that he had a civil lawsuit, arising from his accident, and that its outcome remained pending.  Id.

The Plaintiff testified that, during his motor vehicle accident, his knees had pressed through the front dashboard, and that approximately a year and a half later, he had begun to experience arthritis in his knees.  [T. 363].  The Plaintiff further explained that he was having a second surgery on his right knee in the near future.  Id.

The ALJ asked about the Plaintiff's possible depression, and the Plaintiff testified, "I don't have much will to get up and do much of anything," as "I was pretty busy working and now I really can't do much."  Id.  The Plaintiff stated that his son thought he was worthless, in part because he had been unable to play with his son.  [T. 363-64].

The Plaintiff testified that, after he took his son to school, he took his pain medication, and slept until 3:00 o'clock p.m., when his son returned home.  [T. 364].  The Plaintiff stated that he was able to help his son with his homework, load the dishwasher, and do laundry, but that he was unable to do any yard work.  Id.  The Plaintiff testified that he had no hobbies although, in the past, he had used his computer, but he now had difficulty sitting at the keyboard because of pain.  [T. 364-65].

The Plaintiff stated that he could walk for approximately a block, to a block and a half, before he started to get back spasms.  [T. 365].  He also could only sit comfortably for fifteen (15) to twenty (20) minutes, before experiencing discomfort, and that the heaviest thing he had lifted in the past year was a gallon of milk.  Id.

The Plaintiff stated that he had completed employment applications but, when the employer was informed about his injuries, he had been told to come back when he was healthy.  [T. 366].  The Plaintiff attested that he had not applied for a job since December of 2003, and that he could not return to his former job because it was too physically demanding.  [T. 366-67].  The Plaintiff added that his doctors were not surprised that he had difficulty securing employment, given the extent of his injuries. Id.

The Plaintiff was only able to perform neck exercises and added that he had experienced a neck injury approximately twenty (20) years ago but, at the time of the accident, it was not an issue.  Id.

After the accident, the Plaintiff estimated that he was at home for approximately three (3) to four (4) weeks.  Id.  The Plaintiff stated that he had attempted to go back to work but, when that was unsuccessful, he decided to focus on his therapy and

recovery.  [T. 367-68].  The Plaintiff further explained that he was waiting on his doctors' approval before applying for a job.  [T. 368].

The Plaintiff's counsel asked the Plaintiff if, other then his prior and future knee surgeries, his doctors had discussed other surgical options.  [T. 368].  The Plaintiff stated that his doctors wanted to perform surgery on his middle back, but were waiting until his right knee had healed sufficiently before setting a surgery date.  Id.  The Plaintiff testified that, because of his medication, he had difficulty concentrating and he could not drive, because his medication caused sleepiness.  Id.  He also had difficulty getting along with other individuals if he was not on his pain or depression medications.  [T. 369].

Next, the Plaintiff's counsel asked the Plaintiff if he would be successful at the positions where he had applied for employment.  Id.  The Plaintiff did not believe he could be successful because he had applied for work as a full-time cashier, and he did not believe that he could stand for an eight (8) hour shift.  Id.  The Plaintiff added that even if he were allowed to sit, rather than stand, he did not believe he could sit for a long period of time, because sitting only exacerbated his tendency to fall asleep.  Id.

The ALJ then swore the Medical Expert ("ME") to testify.  [T. 370].  The ME testified that the Plaintiff had been treated for a complex, intractable pain syndrome,

that is related to pain in the low back, middle back, and neck regions, following the Plaintiff's vehicle accident.  Id.  The ME stated that the Plaintiff had been diagnosed with a sprained  neck and middle back, and that an initial MRI had found a herniation in the middle back region, although subsequent MRIs showed only a small bulging disc, and not a herniation.  Id.  The ME explained that the Plaintiff's lower back condition was attributed to disc disease.  Id.  The ME noted that another MRI had shown mild to moderate canal narrowing, but he added that those findings had not been associated with any clinical loss of function or neurological loss.  [T. 371].  The ME added that the Plaintiff's treatment had been non-surgical.  Id.

According to the ME, Dr. Anderson concluded that the Plaintiff had some sensation loss on the left side, but the ME found that conclusion inconsistent with the Plaintiff's imaging studies.  Id.  The ME noted that the physical therapist had found close to normal range of motion in the Plaintiff's lumbar spine, in September of 2002, although Dr. Anderson had repeatedly found significant reduction in the Plaintiff's range of motion, in his lower back and neck, due to pain.  Id.  The ME added that the Plaintiff had headaches due to muscle contraction, and that the Plaintiff had received arthoscopic surgery for a degenerative condition in his right knee.  Id.

The ALJ asked the ME if the Plaintiff's impairments met or equaled any Listing, and the ME responded that, absent any ongoing neurological loss associated with the spinal conditions, the Plaintiff's impairments did not meet any Listing.  [T. 372].

Next, the ALJ asked about work restrictions, and the ME stated that the Plaintiff should have limited time on his feet, as well as lifting restrictions, and occasional limitations on foot pedals on the right, overhead work, bending, twisting, stooping, kneeling, crawling, crouching, and climbing.  Id.  With respect to Dr. Johnson's conclusion, that the Plaintiff should be limited to two (2) hours of standing or walking, and six (6) hours of sitting in an eight (8) hour work day, the ME stated that he agreed with the two (2) hour limitations on standing up, or walking, prior to the Plaintiff's knee injury, but he not see any medical conditions or pathology to support the six (6) hour sitting limitation.  [T. 374].  Instead, the ME concluded that Dr. Johnson's conclusions were likely based on the Plaintiff's allegations of pain.  Id.  The ALJ then concluded her questioning of the ME.  Id.

On cross-examination, the Plaintiff's counsel asked the ME what types of evidence supported his recommended restrictions.  [T. 374-75].  The ME responded that he was looking for neurological, and joint damage, which might justify Dr.

Johnson's severe restrictions but, because the Record demonstrated that the Plaintiff's disc herniation had receded, and because the Plaintiff had only been diagnosed with a back and neck sprain, the ME concluded that Dr. Johnson's restrictions were unsupported.  [T. 375].  The Plaintiff's counsel asked the ME if there were other conditions, beyond the neurological findings, to support the RFC findings, and the ME responded that the Plaintiff's limited range of motion would affect his assessment, although he noted that the physical therapist had found normal range of motion in the Plaintiff's lower back.  [T. 375-76].

The Plaintiff's counsel then asked the ME about the findings of Dr. Johnson's report, and the ME answered that Dr. Johnson's report demonstrated pain with motion of the neck, back, and right knee, but that the Plaintiff's neck measurements were quite good.  [T. 376].  The ME added that Dr. Johnson's findings as to the Plaintiff's lower back were in contradiction with Dr. Anderson's findings, concerning the Plaintiff's range of motion in his neck, and lower back.  Id.  The ME stated that he was suspicious of Dr. Johnson's report of thirty-five (35) degree flexion in the lower back, because Dr. Anderson found eighty (80) degree straight leg raising, which the ME concluded would be impossible if the Plaintiff had the limited range of motion in the lower back that had been reported by Dr. Johnson.  [T. 376-77].

- 37 -

Next, the Plaintiff's counsel asked why the ME did not mention the Plaintiff's muscle spasms, when he disagreed with Dr. Johnson's conclusions.  [T. 379].  The ME admitted that Dr. Anderson had found muscle spasms on a regular basis, but he observed that Dr. Johnson did not find any evidence of a limiting muscle spasm.  Id. The ME stated that muscle spasms can be limiting, but that the Plaintiff's alleged muscle spasms would not support Dr. Johnson's proposed restrictions.  Id. Furthermore, the ME noted that the Plaintiff had not been prescribed medications for muscle spasms, or a regular exercise and stretching program.  Id.  The Plaintiff's counsel countered that the Plaintiff had been prescribed an exercise program, but had been unable to complete it because of pain.  Id.  The ME responded by stating that the Plaintiff's inability to exercise was suspicious because individuals with his clinical picture are able to exercise.  [T. 379-80].

The Plaintiff's counsel then asked the ME if the Plaintiff's prescription medications were for people with very little pain, and the ME responded that the Plaintiff's medications were sometimes prescribed for people who report a lot of pain. [T. 380].  The ME agreed that Dr. Anderson had likely prescribed the Plaintiff because he had reported significant pain.  Id.  The ME added that people are usually prescribed

muscle relaxers, or an exercise program, and not heavy-duty narcotics for muscle spasms.  [T. 380-381].

After the Plaintiff's counsel had finished his questioning of the ME, the ALJ swore the Vocational Expert ("VE") to testify.  [T. 381].  The ALJ asked if the Plaintiff's testimony had changed the VE's conclusions, and the VE reported no changes in his conclusions.  Id.  The ALJ then posed a hypothetical, in which he asked the VE to assume an individual who was thirty-eight (38) years old, who had completed the twelfth grade, with the Plaintiff's past relevant work history and impairments, who was taking medications with the singular side effect of sleepiness, who was able to lift and carry ten (10) pounds occasionally, five (5) pounds frequently, and whose work requires minimal bending, stooping, crouching, crawling, twisting, kneeling, or climbing, with occasionally right foot pedal manipulation, overhead work, reaching, pushing, or pulling, as well as occasional repetitive rotation fixation, flexing, or extension of the neck.  [T. 381-82].  The ALJ asked whether that individual would be able to return to the Plaintiff's past relevant work, and the VE responded the Plaintiff's past work would exceed the exertional requirements of the hypothetical.  Id.

The ALJ then asked the VE if there were other jobs in the regional or national economies, which could be performed by an individual with those limitations.  [T. 382-83].  The VE explained that the individual could work as a bench assembler, and that approximately 3,000 to 4,000 such positions existed in the State of Minnesota; that the individual could work as a cashier and approximately 2,000 to 3,000 of those positions existed in the State of Minnesota; and that the individual could work as a surveillance system monitor, and that approximately 1,000 such positions existed in the State of Minnesota.  [T. 383].

The ALJ then revised the hypothetical, so as to include an individual who was limited to sedentary work on his feet for less than two (2) hours, and sitting and standing for less than six (6) hours out of eight (8) hour day, and who could never kneel, crouch, crawl, stoop, or use vibrating equipment.  [T. 383].  The VE testified that there would be no full-time work available for such an individual in the regional or national economies.  Id.  The ALJ then concluded his questioning of the VE.  Id.

In his closing, the Plaintiff's counsel argued that the ME's testimony was results-oriented because he had not considered the range of motion studies in the Plaintiff's lower back, which impacted upon his ability to sit.  [T. 384].  The Plaintiff's counsel also argued that the medical records supported a finding that the

Plaintiff suffered from nerve root impingement, and that the only inconsistency among the doctors arose from the conclusions of the ME, and the State Agency physicians, who had not examined or treated the Plaintiff.  [T. 385-85].  Lastly, the Plaintiff's counsel asked the ALJ to request a consultative examination, with respect to the Plaintiff's depression, if the ALJ concluded that the Plaintiff was not entitled to DIB. Id.

C.   The ALJ's Decision.  The ALJ issued her decision on January 3, 2006. [T. 15-25].  As she was required to do, the ALJ applied the sequential, five-step analytical process that is prescribed by Title 20 C.F.R. §404.1520.[24]  The ALJ first

---

[24]Under the five-step sequential process, the ALJ analyzes the evidence as follows:

> (1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Simmons v. Massanari, 264 F.3d 751, 754-55 (8th Cir. 2001).

found that the Plaintiff last met the insured status requirements for a period of disability, and for DIB, on December 31, 2007. [T. 17]. The ALJ also concluded that the Plaintiff had not engaged in substantial gainful activity since his alleged onset date of July, 9, 2002. Id.

Next, the ALJ examined whether the Plaintiff was subject to any severe physical impairments, which would substantially compromise his ability to engage in work activity. [T. 18]. After considering the Plaintiff's medical history, which included the reports of the Plaintiff's treating physicians, and the testimony adduced at the Hearing, the ALJ concluded that the Plaintiff was severely impaired by chronic pain syndrome and cervical strain/sprain, degenerative disc disease of the lumbar spine, thoracic outlet syndrome, degenerative disc disease of the right knee, chronic medial collateral ligament injury of the right knee, status post-arthroscopy, and muscular contracture headache. Id. The ALJ determined that there were "no other severe impairments established by the objective medical evidence." [T.18].

---

A claimant is disabled only if he is not engaged in substantial gainful activity; he has an impairment that limits his ability to perform basic work activities; and his impairment is either presumptively disabling, or he does not have the residual functional capacity to perform his previous work, and he cannot perform other work existing in the national economy. Id. at 754.

At the Third Step, the ALJ compared the Plaintiff's severe impairments with the impairments contained in Appendix 1, Subpart P, of the Regulations.  See, Title 20 C.F.R. §404.1520(d).   The ALJ determined that the Plaintiff's physical impairments did not meet, or equal, the criteria of any Listed Impairment, based on the Record as a whole.  Id.  She also noted that the Plaintiff had not been diagnosed with depression by any psychiatrist, psychologist, or other mental health professional, nor had he received any ongoing mental health care.  Accordingly, the ALJ concluded that the Plaintiff's claim of depression did not meet the Listings criteria.  [T. 18].

The ALJ proceeded to determine whether the Plaintiff retained the RFC to engage in the duties required by his past relevant work, or whether he was capable of engaging in other work which existed in significant numbers in the national economy. Id.  RFC is defined in the Regulations as the most an individual can still do after considering the effects of physical limitations that can affect the ability to perform work-related tasks.  See, Title 20 C.F.R. §404.1545, and Social Security Ruling 96-8p. The ALJ recognized that, in order to arrive at the Plaintiff's RFC, she was obligated to consider all of the symptoms, including the Plaintiff's subjective complaints of pain, and that those complaints were to be evaluated under the standard enunciated in

Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), Social Security Ruling 96-7p, and

Title 20 C.F.R. §404.1529.

After considering the entire Record, including the testimony adduced at the

Hearing, the opinions of the Plaintiff's treating physicians and the impartial ME, the

objective medical evidence, and the Plaintiff's subjective complaints of pain, the ALJ

determined the Plaintiff's RFC to be as follows:

> [The Plaintiff] had the residual functional capacity to lift a
> maximum of ten pounds occasionally and five pounds
> frequently, with minimal bending, stooping, twisting,
> crouching, crawling, kneeling, and climbing, occasional
> right foot pedal manipulations, occasional overhead reach,
> pushing, and pulling, and no repetitive rotation, fixation,
> flexion, or extension of the neck.

[T. 18].

The ALJ concluded that the RFC was consistent with the weight of the Record, but

was inconsistent with the Plaintiff's assertion that he had been disabled, by his

physical impairments, from all work activity, since July 9, 2002.  [T. 19].

In determining the Plaintiff's RFC, the ALJ first considered the testimony of

the Plaintiff, that he had been unable to work since July 9, 2002, because of three (3)

ruptured discs, and a torn ligament along his spine, which produced severe back pain.

[T. 18].  The ALJ noted that the Plaintiff testified that he was unable to do most

- 44 -

household chores without experiencing significant amounts of pain.  Id.  The Plaintiff also testified that he had experienced neck pain for the past twenty (20) years, although it had worsened in the past few years.  [T. 18-19].  Furthermore, the Plaintiff testified that he must lie down with his legs elevated in order to avoid muscle spasms, that he spends most of his day resting, and that he is unable to lift more than a gallon of milk, walk more than one and a half blocks, or sit for fifteen (15) to twenty (20) minutes, before changing positions.  [T. 19].

In reaching her conclusion on the Plaintiff's RFC, the ALJ found that the Plaintiff's claims of pain, and his functional limitations, were credible, and she took them into account in determining his RFC.  Id.  However, the ALJ found that the Plaintiff's assertion, that he was incapable of working at any exertional level was without merit, because of significant inconsistencies in the Record as a whole.  Id. The ALJ noted that, after the accident, Dr. Kandiko directed the Plaintiff to remain off work until July 29, 2002, but on July 31, 2002, he released the claimant to return to work on August 5, 2002.  [T. 20].

The ALJ found that Dr. Kandiko's opinion, that the Plaintiff could return to work, was consistent with the Plaintiff's treatment and physical therapy notes from July and August 2002, which revealed that the Plaintiff had negative straight leg

raising test, good functioning in the extremities, and normal range of motion of the cervical and lumbar spines, except for extension pain at the end range in the low back. Id. The Record further showed that the Plaintiff was walking without difficulty, and that his activity level was gradually increasing. Id. On August 26, 2002, Dr. Kandiko recommended that the Plaintiff refrain from working until September 4, 2002, based upon the Plaintiff's complaints of pain, and a physical examination which revealed tenderness in the Plaintiff's middle back. Id. However, the ALJ noted that Dr. Kandiko did not impose any permanent restrictions. Id.

A physical examination, in September of 2002, demonstrated limited cervical and lumbar range of motion due to pain, but the Plaintiff reported a decrease in pain after six (6) physical therapy sessions. Id. The ALJ found that, despite imposing limits on the Plaintiff, Dr. Anderson recommended that the Plaintiff begin a daily walking program. Id. In April of 2003, the Plaintiff had an MRI performed on his middle back, which revealed only mild disc disease, and a mild middle disc bulge, but there was no evidence of any acute disc herniation, canal narrowing, or nerve root impingement. Id. In addition, Dr. Holte, who began treating the Plaintiff in January of 2003, reviewed the Plaintiff's MRI results, and concluded that the Plaintiff did not require surgery. Id.

The ALJ found that the Plaintiff's increase in pain, in June of 2003, was due to the fact that the Plaintiff had been out of pain medications for two (2) weeks.  Id.  In July of 2003, the Plaintiff's neurological exam results were normal, and there was no evidence of any ligament dislocation, or instability.  Id.  The Plaintiff also reported that his chiropractic care decreased his pain, and increased his ability to perform daily tasks.  Id.  The Plaintiff reported no significant adverse effects from his pain medication, other than mild sedation, and his medication had kept his neck and back pain under control.  Id.

The ALJ observed that the Plaintiff had monthly appointments with Dr. Anderson, from September of 2002, through October of 2003, but that there was no evidence of medical treatment, from October of 2003, until March 18, 2004, which suggested that the Plaintiff's neck and back pain was under control with medication, during that period of time, and that it did not persist continuously between appointments.  Id.

The ALJ also placed great weight on the conclusions of ME.  [T. 19].  The ME testified that the Plaintiff had  neck, back, and knee pain, since the car accident in July 9, 2002.  Id.  The ME concluded that the Plaintiff's neck pain was caused by a cervical sprain or strain, and that an MRI, which was performed shortly after the accident, had

- 47 -

revealed a middle disc herniation and compression of the nerve root.  Id.  However, the ME reported that those findings were not associated with any clinical or neurological findings, and added that an examination, in July of 2004, revealed no neurological loss.  Id.

The ALJ also considered the opinions of the State Agency physicians, who had concluded that the Plaintiff was capable of performing a modified range of medium work.  Id.  However, the ALJ accorded those opinions little weight, because the opinions were rendered without the benefit of later medical evidence.  Id.

The ALJ also considered the opinion of the Plaintiff's chiropractor, Dr. Copp, who opined that the Plaintiff had been disabled since his accident, due to multiple disc herniation, and nerve root compression.  [T. 20].  First, the ALJ noted that Dr. Copp's opinion was not entitled to the weight of a medical opinion because he was a chiropractor, rather than a medical doctor.  Id.  However, the ALJ considered Dr. Copp's opinion, under the "other sources" provision of Title 20 C.F.R. §404.1513. Id.  Second, the ALJ did not give Dr. Copp's opinion great weight because it was inconsistent with other substantial medical evidence in the Record, including the opinion of the ME.  [T. 20-21].  The ALJ also found Dr. Copp's opinion inconsistent with the Plaintiff's own statement, that his chiropractic treatment provided relief.  [T.

21]. Lastly, the ALJ concluded that Dr. Copp's statement was not entitled to controlling weight, because it was a medical opinion on an issue reserved for the Commissioner. Id.

Next, the ALJ considered the opinion of the Plaintiff's treating physician, Dr. Anderson, who believed that the Plaintiff was not capable of performing gainful employment. Id. The ALJ began by recognizing that, generally, controlling weight is accorded to the opinion of a treating source who is a specialist in the area of the medical impairment in question. Id. However, the ALJ concluded that Dr. Anderson's opinions were inconsistent with the Plaintiff's overall course of medical treatment. Id.

The ALJ also observed that, at the Hearing, the ME disagreed with Dr. Anderson's opinions, because they appeared to be primarily based on the Plaintiff's subjective assertions of pain. Id. The ME had acknowledged that Dr. Anderson consistently referred to the Plaintiff's reduced range of motion, and muscle spasms in the neck. Id. However, the ME also recognized that the Plaintiff's consultative examination, in March of 2005, had found a good range of motion in his neck, and the ME noted that the finding contradicted Dr. Anderson's conclusions. Id. The ME also reported that muscle spasms, by themselves, do not result in severe restrictions, and

that, normally, muscle relaxers and stretching exercises are prescribed for muscle spasms.  Id.  The ME also found that the Plaintiff's spinal condition did not cause any neurological loss, and that the medical record did not document pathological diagnoses, or findings, which would justify severe restrictions.  Id.

Based in part on the ME's testimony, the ALJ gave some weight to Dr. Anderson's opinion, given his treating relationship with the Plaintiff.  Id.  However, the ALJ did not afford Dr. Anderson's opinion controlling weight, because of the inconsistencies between his opinion and the Record as a whole.  Id.

The ALJ also considered the opinion of Dr. Holte who, had examined the Plaintiff in March of 2004, and concluded that the Plaintiff was totally disabled.  [T. 22].  The ALJ did not give great weight to Dr. Holte's opinion, because it was based upon the Plaintiff's subjective assertions of pain, rather than upon the objective medical evidence in the Record.  Id.  The ALJ further noted that, at the time of the Plaintiff's examination, he had gone without medical treatment for five (5) months, which suggested that his pain did not significantly limit his activities between medical appointments.  Id.  The ALJ explained that the Plaintiff had received conservative treatment for his neck and back pain, including physical therapy, epidural steroid injections, pain medications, chiropractic treatment, heat and ice, and trigger point

injections.  Id.  In addition, the Plaintiff had not required surgery, hospitalization, or emergency room treatment, for his chronic pain.  Id.  The ALJ also recognized that the Plaintiff's symptoms had improved with medical treatment, such as trigger point injections, and the use of prescribed pain medications.  Id.  Lastly, the ALJ noted that Dr. Holte's conclusion was not entitled to controlling weight since it was a medical opinion on an issue reserved for the Commissioner.  Id.

Further, the ALJ considered Dr. Johnson's consultative examination in March of 2005.  Id.  Dr. Johnson had determined that the Plaintiff should be limited to sitting less than six (6) hours, and standing for less than two (2) hours, in an eight (8) hour workday.  Id.  The ALJ noted that Dr. Johnson's conclusion was not supported by objective medical evidence, or by clinical findings.  Id.  The ALJ further noted that page ten (10) of Dr. Johnson's report, which contained the Plaintiff's recommended sitting and standing restrictions, was unsigned, and appeared to have been submitted after Dr. Johnson's original report.  Id.  After careful consideration, the ALJ decided to give page ten (10) of Dr. Johnson's report less weight, based on the testimony of the ME, and the absence of a signed medical statement from Dr. Johnson.  Id.  The ALJ gave greater weight to the remainder of Dr. Johnson's restrictions, which were essentially consistent with the Plaintiff's RFC.  Id.

The ALJ acknowledged that, after the Hearing, the Plaintiff's counsel had submitted an MRI of the Plaintiff's spine, which revealed disc disease, and a mild flattening of the ventral cord. Id. On November 7, 2005, the MRI was sent to the ME, along with Interrogatories that requested his opinion as to whether that new medical evidence altered the ME's testimony. Id. The ME opined that, absent any associated neurological findings, the MRI did not change his testimony, and he found that the Plaintiff's condition was stable. [T. 23]. The ALJ recognized that the ME was a non-treating and non-examining physician, but she concluded that the ME was qualified to render an opinion. Id.

Lastly, the ALJ noted that the Plaintiff's daily activities were also inconsistent with his allegations of disabling pain, but consistent with the recommended RFC. Id. The Plaintiff was able to help his son with his homework, drive a car, watch television, and perform some light household chores and yard work. Id.

Proceeding to the Fourth Step, the ALJ determined that the Plaintiff would be unable to perform his past relevant work as a swimming pool installer, janitor, delivery man, and jogger. [T. 23-24]. In reaching that conclusion, the ALJ relied upon the testimony of the VE. Id.

However, proceeding to the Fifth Step, the ALJ concluded that a significant number of jobs existed, in the national and regional economies, which the Plaintiff could perform. [T. 24]. The ALJ recounted the VE's testimony, that persons with the Plaintiff's functional limitations could work as a bench assembler, or cashier. Id. The ALJ also noted that the VE testified that there existed approximately 3,000 assembler jobs, and 2,000 cashier jobs, in the economy of the State of Minnesota. Id. Finding the VE's testimony to be credible, and persuasive, the ALJ found that there existed a significant number of jobs that the Plaintiff could perform. Id. As a result, the ALJ concluded that the Plaintiff was not disabled. Id.

## IV. Discussion

A.   Standard of Review. The Commissioner's decision must be affirmed if it conforms to the law and is supported by substantial evidence on the Record as a whole. See, Title 42 U.S.C. §405(g); see also, Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 (8th Cir. 2005); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002); Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998). This standard of review is more than a mere search for the existence of evidence supporting the Commissioner's decision. See, Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994), citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488-91 (1951). Rather, the substantiality of

the evidence must take into account whatever fairly detracts from its weight, see, <u>Cox v. Apfel</u>, 160 F.3d 1203, 1206 (8th Cir. 1998); <u>Moore ex rel. Moore v. Barnhart</u>, supra at 721, and the notable distinction between "substantial evidence," and "substantial evidence on the record as a whole," must be observed.  See, <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1136 (8th Cir. 1998).  On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied.  See, <u>Loving v. Secretary of Health and Human Services</u>, 16 F.3d 967, 969 (8th Cir. 1994); <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669 (8th Cir. 1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  See, <u>Neal ex rel. Walker v. Barnhart</u>, 405 F.3d 685, 688 (8th Cir. 2005), citing <u>Nelson v. Sullivan</u>, 966 F.2d 363, 366 n.6 (8th Cir. 1992); <u>Moad v. Massanari</u>, 260 F.3d 887, 890 (8th Cir. 2001).  Stated otherwise, substantial evidence "is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  <u>Cox v. Barnhart</u>, 471 F.3d 902, 906 (8th Cir. 2006).  Therefore, "'[i]f, after review, we find it possible to draw two inconsistent positions

from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits.'"  Vandenboom v. Barnhart, 421 F.3d 745, 749 (8th Cir. 2005), quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001), quoting Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996).   Under this standard, we do not reverse the Commissioner even if this Court, sitting as the finder-of-fact, would have reached a contrary result.  See, Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

Consequently, the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal.  See, Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006), citing Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); see also, Haley v. Massanari, 258 F.3d 742, 746 (8th Cir. 2001)("[A]s long as there is substantial evidence in the record to support the Commissioner's decision, we will not reverse it simply because substantial evidence exists in the record that would have supported a different outcome, Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995), or 'because we would have decided the case differently.'"), quoting Holley v. Massanari, 253 F.3d

1088, 1091 (8th Cir. 2001).  Our review of the ALJ's factual determinations, therefore, is deferential, and we neither reweigh the evidence, nor review the factual record <u>de novo</u>.  See, <u>Hilkemeyer v. Barnhart</u>, 380 F.3d 441, 445 (8th Cir. 2004); <u>Flynn v. Chater</u>, 107 F.3d 617, 620 (8th Cir. 1997); <u>Roe v. Chater</u>, 92 F.3d 672, 675 (8th Cir. 1996).

Lastly, where, as here, the Plaintiff submits additional evidence to the Appeals Council for review, which was not considered by the ALJ, our task on review is not completed until we "determine whether the ALJ's decision 'is supported by substantial evidence on the record as a whole, including the new evidence submitted after the determination was made.'" <u>Bergmann v. Apfel</u>, 207 F.3d 1065, 1068 (8th Cir. 2000), quoting <u>Riley v. Shalala</u>, 18 F.3d 619, 622 (8th Cir. 1999); see also, <u>Flynn v. Chater</u>, supra at 621.  "Evaluating such evidence requires us to determine how the ALJ would have weighed the newly submitted evidence if it had been presented at the original hearing." <u>Jenkins v. Apfel</u>, 196 F.3d 922, 924 (8th Cir. 1999), citing <u>Riley v. Shalala</u>, supra at 622.

B.      <u>Legal Analysis</u>.  In support of his Motion for Summary Judgment, the Plaintiff advances the following arguments:

- 56 -

1.    That the ALJ improperly evaluated the Plaintiff's credibility;

2.    That the ALJ failed to honor the treating physician rule;

3.    That the ALJ erred in her determination that the Plaintiff's depression was not a severe impairment; and

4.    That the ALJ incorrectly determined that the Plaintiff did not meet or equal Listing 1.04A.

Plaintiff's Memorandum in Support, Docket No. 20, at 25-32.

Since the ALJ's evaluation of the Plaintiff's credibility impacts upon the weight she accorded to the treating physician's opinion, and to her determination as to the severity of the Plaintiff's mental impairment, we address the credibility issue first.

1.    Whether the ALJ Improperly Evaluated the Plaintiff's Credibility.

a.    Standard of Review. The governing law makes clear that credibility determinations are initially within the province of the ALJ. See, Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006)("Where adequately explained and supported, credibility findings are for the ALJ to make."), quoting Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000), citing Tang v. Apfel, 205 F.3d 1084, 1087 (8th Cir. 2000); see also, Driggins v. Bowen, 791 F.2d 121, 125 n.2 (8th Cir. 1986); Underwood v. Bowen, 807 F.2d 141, 143 (8th Cir. 1986). As a finding of fact, the determination

must be supported by substantial evidence on the Record as a whole.  See, <u>Leckenby v. Astrue</u>, 487 F.3d 626, 632 (8th Cir. 2007)("We do not reweigh the evidence presented to the ALJ, and we defer to the ALJ's determinations regarding the credibility of testimony, as long as these determinations are supported by good reasons and substantial evidence."), citing <u>Gonzales v. Barnhart</u>, 465 F.3d 890, 894 (8th Cir. 2006); see also, <u>Stout v. Shalala</u>, 988 F.2d 853, 855 (8th Cir. 1993).

To be legally sufficient, the ALJ must make an express credibility determination, must set forth the inconsistencies in the Record which led to the rejection of the specific testimony, must demonstrate that all relevant evidence was considered and evaluated, and must detail the reasons for discrediting that testimony. See, <u>Eichelberger v. Barnhart</u>, supra at 590 ("The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints."); <u>Masterson v. Barnhart</u>, 363 F.3d 731, 738 (8th Cir. 2004); <u>Shelton v. Chater</u>, 87 F.3d 992, 995 (8th Cir. 1996); <u>Hall v. Chater</u>, 62 F.3d 220, 223 (8th Cir. 1995); <u>Ricketts v. Secretary of Health and Human Services</u>, 902 F.2d 661, 664 (8th Cir. 1990). These requirements are not mere suggestions, but are mandates that impose affirmative duties upon the ALJ. See, <u>Johnson v. Secretary of Health and Human Services</u>, 872 F.2d 810, 814 n.3 (8th Cir. 1989).

The mode and method by which an ALJ must make and support a credibility finding, on the basis of subjective symptoms, has been firmly established in the Eighth Circuit by Polaski v. Heckler, supra, and its progeny. See, e.g., Flaherty v. Halter, 182 F. Supp. 2d 824, 829 (D. Minn. 2001); Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996); Shelton v. Chater, supra; Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996). Factors which the ALJ must consider, in the evaluation of the Plaintiff's subjective symptoms, include the Plaintiff's prior work record and the observations of third parties, and of physicians, concerning:

> 1.  the claimant's daily activities;
>
> 2.  the duration, frequency, and intensity of the pain;
>
> 3.  precipitating and aggravating factors;
>
> 4.  dosage, effectiveness and side effects of medication;
>
> and
>
> 5.  functional restrictions.

Polaski v. Heckler, supra at 1321-22; see also, Gonzales v. Barnhart, supra at 895 (listing factors for credibility analysis); Choate v. Barnhart, 457 F.3d 865, 871 (8th Cir. 2006)(same).

The ALJ must not only consider those factors, but he must list them and explain the resolution of any demonstrable conflict or inconsistency in the Record as a whole.

Cf., Jones v. Chater, supra at 826; Delrosa v. Sullivan, 922 F.2d 480 (8th Cir. 1991);

Carlock v. Sullivan, 902 F.2d 1341 (8th Cir. 1990). "However, the ALJ need not

explicitly discuss each Polaski factor." Eichelberger v. Barnhart, supra at 590, citing

Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). "The ALJ only need

acknowledge and consider these factors before discounting a claimant's subjective

complaints." Id.

It is well-settled that an ALJ may not disregard a claimant's subjective

complaints of pain, or other subjective symptoms, solely because there is no objective

medical evidence to support them. See, Ostronski v. Chater, supra at 418; Jones v.

Chater, supra at 826; but cf., Johnston v. Shalala, 42 F.3d 448, 451 (8th Cir. 1994)

(ALJ should consider absence of objective medical basis as a factor to discount the

severity of a claimant's subjective complaints of pain). "Although 'an ALJ may not

disregard [a claimant's] subjective pain allegations solely because they are not fully

supported by objective medical evidence, an ALJ is entitled to make a factual

determination that a [claimant's] subjective pain complaints are not credible in light

of objective medical evidence to the contrary.'" Gonzales v. Barnhart, supra at 895,

quoting Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002)[internal citation

omitted].

- 60 -

It is also firmly established that the physiological, functional, and psychological consequences of illness, and of injury, may vary from individual to individual.  See, Simonson v. Schweiker, 699 F.2d 426 (8th Cir. 1983).  For example, a "back condition may affect one individual in an inconsequential way, whereas the same condition may severely disable another person who has greater sensitivity to pain or whose physical condition, due to * * * general physical well-being is generally deteriorated." O'Leary v. Schweiker, 710 F.2d 1334, 1342 (8th Cir. 1983); see also, Landess v. Weinberger, 490 F.2d 1187 (8th Cir. 1974).  Given this variability, an ALJ may discredit subjective complaints of pain only if those complaints are inconsistent with the Record as a whole.  See, Taylor v. Chater, 118 F.3d 1274, 1277 (8th Cir. 1997); Johnson v. Chater, supra at 944.

Nevertheless, as the decisions of this Circuit make clear, the interplay of the Polaski factors in any given Record, which could justify an ALJ's credibility determination with respect to a Plaintiff's subjective allegations of debilitating symptoms, is multi-varied.  For example, an individual's failure to seek aggressive medical care militates against a finding that his symptoms are disabling.  See, Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995); Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994); Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988).  By

the same token, "[i]nconsistencies between subjective complaints of pain and daily living patterns may also diminish credibility." Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996); see also, Lawrence v. Chater, 107 F.3d 674, 676-77 (8th Cir. 1997) (ALJ may discredit complaints that are inconsistent with daily activities); Clark v. Chater, 75 F.3d 414, 417 (8th Cir. 1996); Shannon v. Chater, supra at 487.

Among the daily activities, which counterindicate disabling pain, are: a practice of regularly cleaning one's house, Spradling v. Chater, 126 F.3d 1072, 1075 (8th Cir. 1997); Chamberlain v. Shalala, supra at 1494; cooking, id.; doing yard work, Swope v. Barnhart, 436 F. 3d 1023, 1024 (8th Cir. 2006); and grocery shopping, Johnson v. Chater, 87 F.3d 1015, 1018 (8th Cir. 1996). Although daily activities, standing alone, do not disprove the existence of a disability, they are an important factor to consider in the evaluation of subjective complaints of pain. See, Wilson v. Chater, 76 F.3d 238, 241 (8th Cir. 1996).

        b.    Legal Analysis. In arriving at the Plaintiff's RFC, the ALJ found significant inconsistencies between the Plaintiff's subjective complaints, and the Record as a whole. Guided by Polaski and its progeny, the ALJ found the credibility of the Plaintiff, as to the severity of his impairments, to be undermined by his medical records, and by his course of treatment.

The ALJ found credible the Plaintiff's claims that he suffered a degree of pain and functional limitation, and accordingly, she accommodated those conditions in the formulated RFC.  [T. 19].  However, the ALJ determined the Plaintiff was not incapable of performing work activity at any exertional level because of inconsistencies presented in the Record.  Id.

In discounting the Plaintiff's testimony, the ALJ cited to medical records, which disclosed that the Plaintiff had consistently complained of pain in his neck and back.  [T. 21-22].  However, the ALJ noted that, early on in his treatment, the Plaintiff exhibited negative straight leg raising tests, good functioning in all extremities, and normal range of motion in the cervical and lumbar spines.  [T. 20].  The Plaintiff's physicians had also approved him to return to work, and they directed him to start a daily walking program.  Id.  In addition, an MRI in April of 2003 revealed no disc herniation, canal narrowing, or nerve root impingement.  Id.  As a result, Dr. Holte concluded that surgery was not necessary.  Id.

The ALJ recognized that the Plaintiff reported an increase in pain in June of 2003, but only because he had been without pain medications for two (2) weeks.  Id.  In addition, a neurological examination, in July of 2003, was normal.  Id.  Furthermore, the ALJ concluded that the absence of any medical treatment, from

October of 2003, to March 18, 2004, indicated that the Plaintiff's pain was under control with medications.  [T. 21].  Moreover, during an appointment in March of 2004, the Plaintiff had difficulty standing and walking due to pain, but his straight leg raising test was negative in the seated position, and his motor strength, and sensory examination, were normal.  [T. 22].

The ALJ also relied upon the Plaintiff's course of treatment, and his statements, in making her credibility determination.  First, the Plaintiff testified that his condition improved with medical treatment.  Id.  In addition, the Plaintiff was treated non-surgically, and conservatively, for his neck and back pain, with physical therapy, epidural steroid injections, pain medications, chiropractic treatment, heat and ice, and trigger point injections.  Id.  Lastly, the ALJ observed that the Plaintiff's condition improved with pain medication, trigger point injections, and chiropractic and physical therapy sessions.  [T. 20-22].

The ME's testimony was also key to the ALJ's credibility determination.  The ALJ relied extensively on the ME's determination, that the Plaintiff's low back pain diagnosis was not attributable to any clinical, or neurological findings, that muscle spasms, alone, would not justify severe restrictions, and that there was no evidence of any pathological diagnoses, or neurological loss, due to the Plaintiff's spinal

condition, so as to justify severe physical restrictions.   [T. 19-22].  The ME also concluded that the Plaintiff's post-Hearing MRI did not change his conclusions, given the absence of any associated neurological findings.  [T.22-23].

As to the Plaintiff's activities of daily living, the ALJ noted that the Plaintiff helped his son with his homework, drove a car, watched television, and did some light household chores, including laundry, and loading the dishwasher.  [T. 23].  In addition, the Plaintiff was also able to mow his lawn, as long as someone started the mower for him.  Id.

Lastly, the ALJ recognized that the Plaintiff had worked steadily until 2002, when he suffered his injury, but she found no evidence that he had attempted to find work since that time.  Id.  The ALJ noted that the Plaintiff had not participated in any vocational rehabilitation, or other employment support services, which exhibited a lack of significant motivation to return to employment.  Id.

While the Plaintiff argues that the ALJ only considered his minor daily activities in making her credibility determination, we are compelled to disagree, as the ALJ fulfilled her obligation to thoroughly parse the Record, and to provide a reasoned explanation for her credibility findings.  The ALJ's decision demonstrates that she considered the entirety of the Record, including the objective clinical findings, and the

opinions of the physicians, as well as the Plaintiff's course of treatment, activities of daily living, and work history, in discounting the Plaintiff's testimony.

We do not suggest, however slightly, that the Record was devoid of evidence which supported some of the Plaintiff's subjective complaints, but "[w]e will not disturb the decision of an ALJ who considers, but for good cause expressly discredits, a claimant's complaints of disabling pain," or incapacitation, simply because, in the first instance, we might have reached a different assessment. Gonzales v. Barnhart, supra at 895, quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005), quoting, in turn, Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). Accordingly, "[w]e will defer to the ALJ's findings," where, as here, "they are sufficiently substantiated by the record." Ramirez v. Barnhart, supra at 581; see also, Estes v. Barnhart, supra at 724, citing Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). Since we find no basis to reverse the Plaintiff's credibility ruling, we reject that challenge to the ALJ's determination.

2.      Whether the ALJ Failed to Honor the Treating Physician Rule.

a.      Standard of Review. When a case involves medical opinion -- which is defined as "statements from physicians and psychologists or other acceptable medical sources" -- the opinion of a treating physician must be afforded substantial weight. Title 20 C.F.R. §§404.1527; see also, Forehand v. Barnhart, 364 F.3d 984, 986 (8th Cir. 2004); Burress v. Apfel, 141 F.3d 875, 880 (8th Cir. 1998); Grebenick v. Chater, 121 F.3d 1193, 1199 (8th Cir. 1997); Pena v. Chater, supra at 908.  Nevertheless, an opinion rendered by a claimant's treating physician is not necessarily conclusive.  See, Forehand v. Barnhart, supra at 986 ("A treating physician's opinion is generally entitled to substantial weight, although it is not conclusive and must be supported by medically acceptable clinical and diagnostic data."), quoting Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998).

An ALJ may discount a treating physician's medical opinion, and adopt the contrary medical opinion of a consulting physician, when the treating source's statements are conclusory, unsupported by medically acceptable clinical or diagnostic data, or when the ALJ's determination is justified by substantial evidence in the Record as a whole.  See, Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997); Pena v. Chater, supra at 908; Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir. 1991); Kirby v.

Sullivan, 923 F.2d 1323, 1328 (8th Cir. 1991); Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986).

The opinion of a treating physician may also be discounted if other assessments are supported by better, or by more thorough, medical evidence. See, Rogers v. Chater, supra at 602; Ward v. Heckler, supra at 846. In short, the ALJ is not required to believe the opinion of a treating physician when, on balance, the medical evidence convinces him otherwise. Id. As but one example, a treating physician's opinion is not entitled to its usual substantial weight when it is, essentially, a vague, conclusory statement. See, Piepgras v. Chater, 76 F.3d 233, 236 (8th Cir. 1996), citing Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991). Rather, conclusory opinions, which are rendered by a treating physician, are not entitled to greater weight than any other physician's opinion. Id.; Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995).

The Code of Federal Regulations sets forth additional factors to assist the ALJ in determining what weight should be accorded to the opinion of a given physician, including a treating physician. The Regulations encourage the ALJ to afford more weight to those opinions which are "more consistent with the record as a whole." See, Title 20 C.F.R. §404.1527(d)(4)). More weight is also to be extended to "the opinion of a specialist about medical issues related to his or her area of specialty than to the

opinion of a source who is not a specialist." See, Title 20 C.F.R. §404.1527(d)(5).

When presented with a treating physician's opinion, the ALJ is obligated to examine

the nature and extent of the treatment relationship, attributing weight to such an

opinion that is proportionate to the knowledge that the medical provider has about the

claimant's impairments. See, Title 20 C.F.R. §404.1527(d)(2)(ii). Further, the

Regulations make clear that the opinions of treating physicians, on questions reserved

for the Commissioner -- such as whether a claimant is disabled, or is unable to work

-- are not to be given any weight by the ALJ. See, Title 20 C.F.R. §404.1527(e)(1).

    b. Legal Analysis. The Plaintiff argues that the ALJ erred in

failing to give substantial weight to the opinions of Dr. Anderson, his treating

physician; Dr. Copp, his chiropractor; and Dr. Johnson, the consultative examiner.

In addition, the Plaintiff argues that the ALJ was required to contact Dr. Johnson, so

as to seek additional evidence, or clarification, before issuing her decision. See, Title

20 C.F.R. §404.1512(e). We disagree, for we find that, when the Record is viewed

in its fullness, the ALJ rejected the opinions of Dr. Anderson, Dr. Copp, and Dr.

Johnson, to the extent that they were not supported by substantial evidence.

As previously noted, the ALJ need not give any weight to a consultative, or a

treating physician's conclusory statements regarding total disability. See, Title 20

C.F.R. §404.1527(e)(1); Rogers v. Chater, supra at 602.  If justified by substantial evidence in the Record as a whole, the ALJ can discount the examining, or treating physician's opinion.  See, Rogers v. Chater, supra at 602; Ward v. Heckler, supra at 846.  With respect to the Plaintiff's pain and functional limitations, it is important to note that, here, the ALJ did not entirely disregard the opinions of Dr. Anderson,  Dr. Copp, or Dr. Johnson.  Rather, she determined that parts of their opinions, as to the Plaintiff's disability, were inconsistent with the Record as a whole.

With respect to Dr. Anderson, the ALJ determined that his opinion, that the Plaintiff was not capable of performing gainful employment, was inconsistent with the Plaintiff's overall course of medical treatment.  [T. 21].  Specifically, the ALJ observed that the Plaintiff had a five (5) month gap in treatment, from October of 2003, to March 18, 2004.  Id.  The ALJ reasonably deduced that the Plaintiff's neck and back pain must not, with the help of pain medications, have been continuous in nature.  Id.

In addition, the ALJ relied upon the ME's testimony in discounting Dr. Anderson's opinion.  In his testimony, the ME recognized that Dr. Anderson had repeatedly referred to a limited range of motion, as well as muscle spasms in the cervical region, even though Dr. Johnson's examination revealed that the Plaintiff had

a good range of motion in his neck.  [T. 21].  The ME also concluded that muscle

spasms do not justify severe physical restrictions.  Id.  Lastly, the ME found that there

was no evidence of neurological loss due to the Plaintiff's spinal condition, nor any

documented pathological diagnoses, that would result in severe restrictions.  Id.  The

ALJ relied on the ME's opinion, based on his medical specialization, his familiarity

with the disability evaluation process, and the fact that ME's opinion, unlike Dr.

Anderson's opinion, was consistent with the Record as a whole.  Id.

The ALJ next discounted Dr. Copp's opinion, that the Plaintiff had been

disabled since July 9, 2002, due to multiple disc herniation, and nerve root

compression.  [T. 20-21].  First, the ALJ noted that, since Dr. Copp is a chiropractor,

his opinion is not entitled to the same weight as a medical opinion, pursuant to Title

20 C.F.R. §§404.1527(a)(2), and 404.1513.  [T. 20].  Instead, the ALJ observed that

Dr. Copp's opinion would be considered under the "other sources" provision of Title

20 C.F.R. §404.1513.[25]  Id.  The ALJ recognized that Dr. Copp's opinion directly

_____

[25]Title 20 C.F.R. §404.1513(d)(1) defines other sources as "[m]edical sources
not listed in paragraph (a) of this section (for example, * * * chiropractors * * *)[.]"
"[E]vidence from other sources * * * may be used to show the severity of impairments
and how they affect a claimant's ability to work[.]"  Douglas v. Barnhart, 130 Fed.
Appx. 57, 59 (8th Cir. 2005); Perez-Ichaso v. Astrue, 2008 WL 706604 at * 6 (D.
Minn. March 14, 2008)("The ALJ properly gave little weight to the opinions of [the
claimant's] chiropractors because such evidence is not considered an 'acceptable
source' of medical information to prove disability; it may be used only to show how

conflicted with the Plaintiff's statements, that his chiropractic treatment had provided him with significant pain relief, and was inconsistent with the opinion of the ME, who the ALJ acknowledged as a specialist in physical medicine and rehabilitation. [T. 21]. In addition, the ALJ observed that Dr. Copp's opinion was not entitled to controlling weight because it was a medical opinion on an issue reserved for the Commissioner. Id.

Lastly, the ALJ questioned the validity of Dr. Johnson's opinion, because a page of his report, which contained the sitting and standing limitations, was not signed by Dr. Johnson, and appeared to have been submitted after the original report. [T. 22]. Specifically, Dr. Johnson completed the sitting and standing limitations page, but neglected to list the number of hours that the Plaintiff could perform such activities. [T. 314]. At a later date, a similar page, including the hour limitations, was submitted unsigned. [T. 317, 373]. The unsigned page stated that the Plaintiff would be able to stand for less than two (2) hours, and sit for less than six (6) hours, in an eight (8) hour day. Id. However, even if the page was authentic, the ALJ concluded that Dr. Johnson's sitting and standing limitations were not supported by any objective medical evidence, or clinical findings, and she relied on the ME's testimony in

─────────────────────

an impairment affects the claimant's ability to work."), quoting Cronkhite v. Sullivan, 935 F.2d 133, 134 (8th Cir. 1991).

reaching that conclusion. [T. 22]. Nonetheless, the ALJ gave weight to the remainder of Dr. Johnson's opinion, which aligned with her assessment of the Plaintiff's RFC. Id.

Under the circumstances presented here, we are aware of no authority that requires the ALJ to abdicate her obligation to independently assess credibility, and to critically weigh conflicting medical opinions, simply because a medical source has expressed, in solely conclusory terms, opinions as to the Plaintiff's inability to work. See, e.g., Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005)("A medical source opinion that an applicant is 'disabled' or 'unable to work,' however, involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight."), citing Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004); Vandenboom v. Barnhart, supra at 750 ("Dr. Hines [i.e., the claimant's treating neurologist] was of the opinion that Vandenboom would not be able to return to work, but a treating physician's opinion that a claimant is not able to return to work 'involves an issue reserved for the Commissioner and therefore is not the type of "medical opinion" to which the Commissioner gives controlling weight."), quoting Ellis v. Barnhart, supra at 994. As a consequence, we find that the ALJ fulfilled her responsibilities under the Regulations, by explaining, and justifying,

the weight that was given to each of the medical source opinions, and why she found some opinions more persuasive than others.  See, Title 20 C.F.R. §404.1527(f)(2)(ii).

We are mindful that the ALJ was confronted by competing and conflicting medical opinions, as professed by consultative, and treating physicians and, under those circumstances, the ALJ's obligation is to weigh the competing evidence, and draw findings based upon the substantial weight of the evidence of Record. Consistent with her "function to resolve conflicts among the various treating and examining physicians," Tindell v. Barnhart, 444 F.3d 1002, 1004 (8th Cir. 2006), quoting Vandenboom v. Barnhart, supra at 749-50, we find that the ALJ thoroughly reviewed the entirety of the Record, and based her resolution of the medical disputes on substantial evidence.  We do not suggest that, were we to consider the matter as one of first impression, we would have reached the same result, for we simply acknowledge that the resolution that the ALJ reached was well within the Commissioner's "zone of choice."  See, Vandenboom v. Barnhart, supra at 749, citing, and quoting, Eichelberger v. Barnhart, supra at 589.

As the ALJ repeated explained, the opinions of the Plaintiff's treating, and consulting physicians, as well as those of his chiropractor, were largely predicated on their election to accept the Plaintiff's subjective complaints.  The Record is barren of

any showing that those doctors, or chiropractors, had reviewed, with the detail and intensity exhibited by the ALJ, the Plaintiff's past medical history, as coupled with his own testimony.   There would be a strange warp in the administrative process if an ALJ, who is singularly charged with determining a claimant's believability, should be legally obligated to accept the conflicting credibility analyses of the claimant's physicians and chiropractor.   Indeed, as we have detailed, the case authorities that govern our analysis reject such an approach.

In sum, where, as here, medical evidence conflicts, the obligation of the ALJ is to consider "all of the medical evidence, including [the ME's testimony], weigh this evidence in accordance with the applicable standards, and attempt to resolve the various conflicts and inconsistencies in the record." Hudson ex. rel. Jones v. Barnhart, 345 F.3d 661, 667 (8th Cir. 2003).   After close review, we are satisfied that the ALJ properly weighed the medical opinions in the Record, and afforded those opinions the weight they deserved when considered on the Record as a whole.   See, Bentley v. Shalala, 52 F.3d 784, 785 (8th Cir. 1995)("It is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'"), quoting Cabrnoch v. Bowen, 881 F.2d 561, 564 (8th Cir.1989).

Lastly, the ALJ did not find that Dr. Johnson's opinion was ambiguous, or required clarification, but only that it was not supported by the weight of the evidence in the full Record.   [T. 22].   Consequently, she was not required to contact Dr. Johnson, notwithstanding the Plaintiff's assertion to the contrary.  See, Title 20 C.F.R. §404.1512(e)(1); Hacker v. Barnhart, supra at 938 ("The regulations provide that the ALJ should recontact a treating physician when the information the physician provides is inadequate for the ALJ to determine whether the applicant is actually disabled," but "[t]he regulations do not require an ALJ to recontact a treating physician whose opinion was inherently contradictory or unreliable."); Goff v. Barnhart, supra at 791("While the ALJ has an independent duty to develop the record in a social security disability hearing, the ALJ is not required 'to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped.'"), quoting Stormo v. Barnhart, supra at 806.  As a result, we find no reversible error in that respect.

3.      Whether the ALJ Erred in Her Determination That the Plaintiff's Depression Was Not a Severe Impairment.

The Plaintiff argues that the ALJ erred by not concluding that the his depression was a severe impairment.  An impairment "is not severe if it does not significantly limit your physical or mental ability to do basic work activities."  Title 20 C.F.R. §404.1521(a).  Here, the ALJ concluded that the Plaintiff's depression was not a severe impairment, and she further concluded that the Plaintiff's depression was not a medically determinable impairment as defined in the Code of Federal Regulations.[26]  Id.

An individual must establish that his mental impairment is medically determinable.  See, Title 20 C.F.R. §404.1505(a); Owens v. Barnhart, 109 Fed.Appx. 825, 826 (8th Cir. 2004).  Generally, the evaluation of mental impairments requires a special technique.  See, Title 20 C.F.R. §404.1520a.  The technique requires the ALJ to "first evaluate [the Plaintiff's] pertinent symptoms, signs, and laboratory findings to determine whether [the claimant has] a medically determinable mental impairment(s)."  Title 20 C.F.R. §404.1520a(b)(1).  **If** a medically determinable

_____

[26]The Commissioner argues that the proper issue is whether the ALJ considered the Plaintiff's depression at the later stages in the process.  See, Defendant's Memorandum in Support, Docket No. 20, at 16.  However, the Plaintiff plainly challenges the ALJ's determination that his depression was not a severe impairment. See, Plaintiff's Memorandum in Support, supra at 25.

mental impairment is found the ALJ must "specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s)[.]" Id.

Symptoms include the claimaint's description of the mental impairment although the claimant's statements alone are not enough to establish a mental impairment. See, Title 20 C.F.R. §404.1508(a). "Signs are anatomical, physiological, or psychological abnormalities which can be observed, apart from [the claimant's] statements," and "must be shown by medically acceptable clinical diagnostic techniques." Title 20 C.F.R. §404.1508(b). "Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities," and "must also be shown by observable facts that can be medically described and evaluated." Id. Lastly, "[l]aboratory findings are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques." Title 20 C.F.R. §404.1508(c).

Based upon the full Record, here, the ALJ determined that the Plaintiff's depression was not a medically determinable or severe impairment, because it had not been established by objective medical evidence. [T. 18]. The ALJ based her determination on the absence of a "diagnosis of depression made by any psychiatrist, psychologist, or other mental health professional and no record of any ongoing mental

health treatment."   Id.   We find that the Record supports both of the ALJ's conclusions.

On September 9, 2002, Dr. Anderson reported that the Plaintiff appeared to be suffering from depression, secondary to his loss of function, and his ongoing pain. [T. 290].   However, on that same visit, Dr. Anderson described that the Plaintiff's depression, and his psychological factors, as unremarkable. Id.   Between September 16, 2002, and October 28, 2003, Dr. Anderson described the Plaintiff as being moderately depressed, secondary to his loss of function and ongoing pain. [T. 234, 236, 247, 250, 254, 256, 262, 264, 267, 272, 274, 278, 280, 282, 284, 285, 287, 288]. On April 13, 2004, the Plaintiff told Dr. Anderson that he was having difficulty with his depression, and, at that point, Dr. Anderson described the Plaintiff as severely depressed. [T. 341-42].

On May 11, 2004, the Plaintiff reported moderate to severe depression, and Dr. Anderson prescribed him Effexor. [T. 340].   On November 23, 2004, and December 22, 2004, Dr. Anderson once again reported that the Plaintiff was moderately depressed, secondary to his loss of function and ongoing pain. [T. 322-23, 326-27]. Lastly, on March 4, 2005, Dr. Johnson noted that the Plaintiff had been depressed for approximately two (2) years, due to his inactivity. [T. 308].   However, Dr. Johnson

based that observation primarily upon the Plaintiff's own statements, rather than on any medical evidence. Id. Nonetheless, as we have already concluded, the ALJ was justified in discounting the Plaintiff's subjective complaints, as well as the opinions of Dr. Anderson and Dr. Johnson, because those impressions were inconsistent with the Record.

Moreover, the Record reveals that the Plaintiff's depression symptoms were inconsistent. The Plaintiff had numerous visits with Dr. Anderson, from June 8, 2004, to October 26, 2004, when Dr. Anderson did not report that the Plaintiff was depressed. [T. 329, 331-32, 334, 336, 338]. Absent the impressions of Dr. Anderson, and Dr. Johnson, which were based entirely upon the Plaintiff's subjective complaints, the Record is barren of objective symptoms, signs, or laboratory findings, to support the Plaintiff's claim of a mental impairment. As a result, we find no fault in the ALJ's determination that the Plaintiff did not suffer from a medically determinable impairment. As a result, it was reasonable for the ALJ to conclude that the Plaintiff's depression was not severe given her determination of the Plaintiff's credibility, and the inconsistencies in the Record.

In addition, the Plaintiff's failure to list depression on his application for DIB weighs against a finding that his depression was severe. See, Nelson v. Astrue, 2008

WL 822157 at *18 (D. Minn., March 26, 2008)("A claimant's failure to list depression or anxiety in her application is a significant factor in determining whether such an impairment is severe."), citing <u>Dunahoo v. Apfel</u>, 241 F.3d 1033, 1039 (8th Cir. 2001)("The fact that [the plaintiff] did not allege depression in her application for disability benefits is significant[.]"), citing <u>Smith v. Shalala</u>, 987 F.2d 1371, 1375 (8th Cir. 1993); <u>Metz v. Shalala</u>, 1994 WL 779757 at *5 (E.D. Ark. March 17, 1994)("It is significant that plaintiff did not allege a disabling mental impairment in his application for disability benefits[.]"), aff'd, 49 F.3d 374 (8th Cir. 1995).

Furthermore, the absence of a diagnosis by a mental health professional, and the absence of mental health treatment, also weigh against a finding that the Plaintiff's depression was severe.  See,  <u>Lee v. Astrue</u>, 2008 WL 5172795 at *13 (D. Minn., December 10, 2008)("The absence of an inquiry into a mental impairment, diagnosis, or treatment prior to applying for benefits weighs against finding there to be a mental impairment."), citing <u>Clay v. Barnhart</u>, 417 F.3d 922, 929 (8th Cir. 2005); <u>Overton v. Apfel</u>, 2000 WL 1742082 at *2 (8th Cir., November 28, 2000)[Table Decision](finding that a lack of mental abnormalities, the absence of treatment by mental health professional or prescriptions for psychiatric medications was substantial evidence to support the ALJ's determination that the claimant's depression and anxiety were not

severe), citing Jones v. Callahan, 122 F.3d 1148, 1153 (8th Cir. 1997)(holding that substantial evidence supported the ALJ's conclusion that the mental impairment was not severe where the claimant's daily activities were not restricted by emotional causes and where the claimant was not undergoing mental health treatment or taking psychiatric medications); Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999)(concluding that substantial evidence supported the ALJ's determination that the claimant's mental impairment was not severe where the claimant's daily activities were not indicative of an individual suffering from a severe mental impairment and where she failed to maintain a consistent treatment pattern for her alleged mental impairment).

Life is full of stressors, and few people exist without experiencing the ups and downs of human emotion, but a plaintiff's description of his emotional feelings is insufficient to establish a mental impairment. See, Title 20 C.F.R. §404.1508(a); Klug v. Weinberger, 514 F.2d 423, 429 (8th Cir. 1975)("[S]tatements of the claimant, including his own description of his own impairment (symptoms) are, alone, insufficient to establish the presence of a physical or mental impairment.")[citations omitted]. Notably, the ME did not find, based upon his professional review of the medical record, that the Plaintiff was suffering from a mental impairment, and no

other doctor provided an opinion that such an impairment was presented by the Plaintiff's clinical record.  Unlike the other health care professionals of Record, the ME was present for cross examination and, if the Plaintiff thought there was substantial evidence to support a severe mental impairment, the ME could have been questioned on the subject, but he was not.

Accordingly, we find that substantial evidence supported the ALJ's determination that the Plaintiff's depression was not a medically determined or severe mental impairment.

    4.    <u>Whether the ALJ Incorrectly Determined That the Plaintiff Did Not Meet or Equal Medical Listing 1.04A</u>.

    a.    <u>Standard of Review.</u>  The Commissioner's Listing of Impairments describes those impairments that the Commissioner considers "to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  <u>Title 20 C.F.R. §404.1525(a)</u>.  Here, the Plaintiff contends that he has a disorder of the spine, specifically degenerative disc disease, which meets or equals the requirements of Listing 1.04A.

Listing 1.04A provides for disability to be determined where "[d]isorders of the spine (e.g., * * * degenerative disc disease * * * ), result[ing] in compromise of a nerve root (including the cauda equina) or the spinal cord."  Listing 1.04A further

- 83 -

provides that to meet the Listing criteria the individual must have "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)."

Moreover, "[t]o meet a listing, an impairment must meet all of the listing's specified criteria." Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004), citing Sullivan v. Zebley, 493 U.S. 521, 530 (1990); see also, Brown ex. rel. Williams v. Barnhart, 388 F.3d 1150, 1152 (8th Cir. 2004); Hanovich v. Astrue, 579 F.Supp.2d 1172, 1205 (D. Minn. 2008). Using those standards as our guide, we proceed to analyze the Plaintiff's arguments.

      b.   Legal Analysis. As noted, the Plaintiff claims that the ALJ erred in declining to find that his degenerative disc disease, disc herniation, and disc desiccation, meet or equal, the requirements of Listing of Section 1.04A. We disagree, and find that, in arriving at her decision, the ALJ carefully considered all of the medical evidence in the Record, and that substantial evidence supports her decision.

The Plaintiff alleges that he has a disorder of the spine which has resulted in compromise of the nerve root and the spinal cord.  See, <u>Plaintiff's Memorandum in Support</u>, supra at 28.  Specifically, the Plaintiff contends that his MRI on August 19, 2002, revealed a moderate-sized disc herniation, which had resulted in the flattening of his spinal cord and moderate compression of the nerve root.  <u>Id.</u>  The Plaintiff further notes that his post-Hearing MRI revealed mild disc desiccation and flattening of his thoracic and ventral cord.  <u>Id.</u>  He also maintains that he has met the requirements of Listing 1.04A by demonstrating radiating pain, a limited range of motion, motor loss accompanied with sensory or reflex loss, and positive straight leg testing in both legs.  <u>Id.</u>

For the sake of simplicity, we will analyze the Plaintiff's alleged symptoms separately.  With respect to the Plaintiff's alleged nerve root impingement, the ALJ relied on the ME's testimony in making her decision.  [T. 19].  The ME testified that the Plaintiff's MRI from July of 2002, had revealed disc herniations, which had compressed some nerve roots.  <u>Id.</u>  However, the ME stated that those findings were not associated with any of the Plaintiff's clinical or neurological findings.  <u>Id.</u>  The ME further testified that an examination, in July of 2004, revealed no evidence of neurological loss.  <u>Id.</u>  The ME also concluded that the Plaintiff's medical records did

not provide any pathological diagnoses, or evidence of neurological loss, due to the Plaintiff's spinal condition.  [T. 21].

The Plaintiff's medical records also undermine the Plaintiff's claim of nerve root impingement.  In April of 2003, an MRI revealed no evidence of any acute disc herniation, narrowing of the spinal canal, or nerve root impingement.  Id.  Lastly, the ALJ acknowledged that the Plaintiff's post-Hearing MRI revealed  disc disease, and a mild flattening of the ventral cord.  [T. 22].  However, the ALJ relied on the ME's opinion that, absent any associated neurological findings, the MRI did not change his conclusion that the Plaintiff did not meet or medically equal any of the listed impairments.  [T. 23].

The ALJ also concluded that the Plaintiff's medical records, examinations, and daily activities, did not support the Plaintiff's claims of limited range of motion of the spine, motor loss accompanied by sensory or reflex loss, and positive straight leg raising test.  The ALJ noted that, in July and August of 2002, the Plaintiff had negative straight leg raising tests, good functioning in all extremities, and normal range of motion of the cervical and lumbar areas of his spine.  [T. 20].  The Plaintiff also reported that he was walking without difficultly, and that his activity was gradually increasing.  Id.  In March of 2004, the Plaintiff was unable to stand up

straight, and had difficulty walking on his toes and heels, but he also had a negative straight leg raising test, and normal motor and sensory strength.  [T. 22].   The ALJ also noted that the Plaintiff's claims were inconsistent with his daily activities, including helping his son with homework, driving a car, watching television, and performing light household chores.  [T. 23].

Lastly, we have already concluded that the ALJ was justified in discounting Dr. Anderson's testimony, and relying on the ME's testimony.  [T. 21]. With respect to the Plaintiff's claims, the ME acknowledged that Dr. Anderson had repeatedly noted that the Plaintiff had a reduced range of motion, and muscle spasms in the cervical region.  Id.  However, the ME noted that those findings were based upon the Plaintiff's pain and, as we have already concluded, the ALJ acted properly in discounting the Plaintiff's subjective complaints.  Id.  The ME further reported that Dr. Anderson's findings contradicted Dr. Johnson's consultative examination, which was conducted in March of 2005, and which noted that the Plaintiff had a good range of motion in his neck.  Id.

Furthermore, it is the ALJ's function to resolve conflicts in the medical evidence, and we find no error in the ALJ's decision, based upon the Record as a whole, to ultimately conclude that the Plaintiff's impairments did not meet or equal

the Listed Impairments in Section 1.04A.  The ALJ's decision was well within the available "zone of choice."   See, <u>Nicola v. Astrue</u>, 480 F.3d 885, 886 (8th Cir. 2007)("We will disturb the ALJ's decision only if it falls outside the available 'zone of choice,' and "[a]n ALJ's decision is not outside the 'zone of choice' simply because we might have reached a different conclusion had we been the initial finder of fact."), citing <u>Hacker v. Barnhart</u>, supra at 936; <u>Travis v. Astrue</u>, 477 F.3d 1037, 1042 (8th Cir. 2007)("As there is conflicting evidence on the record, the ALJ's determination that the physicians' opinions were not supported by objective evidence does not lie outside the available zone of choice.).  Accordingly, we reject the Plaintiff's contention, that the ALJ erred in concluding that his impairments did not meet, or equal, the Listings.

As we have previously noted, the Plaintiff submitted additional records from Dr. Copp, and the Jordan Medical Clinic, Dr. Larson, Dr. Olson, and Dr. Anderson, to the Appeals Council.   [T. 390-430].   Under Title 20 C.F.R. §404.970(b), the Appeals Council must consider new and material evidence that relates to the period on, or before, the date of the ALJ's Hearing decision, and then review the ALJ's decision in light of such evidence. See, <u>Title 20 C.F.R. §404.970</u>; <u>Roberson v. Astrue</u>, 481 F.3d 1020, 1026 (8th Cir. 2007).   Here, the Appeals Council considered the

additional reports, as well as the rest of the evidence of Record, and found no reason to alter the ALJ's decision.  [T. 387-88].

Once it is clear that the Appeals Council considered additional evidence, we must determine if the ALJ's decision is still supported by substantial evidence in light of that new evidence, by determining how the ALJ would have weighed that evidence if it had been presented at the Hearing.  See, O'Donnell v. Barnhart, 318 F.3d 811, 815 (8th Cir. 2003)(citing cases); Flynn v. Chater, supra at 622; Mackey v. Shalala, 47 F. 3d 951, 953 (8th Cir. 1995).

The additional medical records from Jordan Medical Clinic reveal several follow-up visits with Dr. Copp, from September of 2004, to May of 2006, and an examination by Dr. Reed on October 11, 2005, which showed that the Plaintiff's condition had remained unchanged.  [T. 390 - 94].  Dr. Reed described the Plaintiff as having significant tenderness along the upper back muscles, but reported no muscles spasms, or tenderness, over the muscles of the Plaintiff's middle back.  [T. 393].

Dr. Larson's records concern treatment of the Plaintiff's right knee.  [T. 396].  In fact, Dr. Larson specifically noted that he was "not aware of any back issues."  [T.

396].  Dr. Olson's records also recount the Plaintiff's treatment and recovery, following the surgery on his right knee.  [T. 404-16].

Dr. Anderson's records, from January of 2005, to April of 2005, reveal that the Plaintiff continued to suffer from muscle spasms and tenderness, and a loss of range of motion in his neck, middle and low back, with difficulty walking or sitting.  [T. 418-29].  The Plaintiff also frequently complained about pain in his right knee, which was still healing from surgery.  Id.

We find no new information in the additional records, which were provided to the Appeals Council, that would support a reversal of the ALJ's decision.  At the time of her decision, the ALJ was cognizant of the Plaintiff's right knee problems, his surgery, and his recovery.  [T. 19].  Furthermore, the additional records demonstrate that the Plaintiff continued to suffer from the same medical problems -- i.e., neck, middle, and low back pain -- and he continued to receive the same conservative treatment of regular checkups, chiropractic treatment, and pain medication.  [T. 390-94, 418-29].  Moreover, as we have detailed, an ALJ's decision is not subject to reversal "merely because substantial evidence would have supported an opposite conclusion."  Khalil v. Barnhart, 58 Fed.Appx. 238, 240 (8th Cir. 2003), quoting Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984).  Notably, the ME's opinion, that the

Plaintiff does not suffer from any Listing Impairment, is not contradicted by any medical opinion that was submitted to either the ALJ, or the Appeals Council.

Accordingly, finding no error in the ALJ's decision, after a thorough and independent review of the Record as a whole, we recommend that Judgment be entered in the Commissioner's favor.

NOW, THEREFORE, It is --

RECOMMENDED:

1.     That the Plaintiff's Motion for Summary Judgment [Docket No.17 ] be denied.

2.     That the Defendant's Motion for Summary Judgment [Docket No. 21] be granted.

Dated:  February 19, 2009                  *s/Raymond L. Erickson*
                                           Raymond L. Erickson
                                           CHIEF U.S.  MAGISTRATE JUDGE

- 91 -

## NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties by no later than **March 6, 2009**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing by no later than **March 6, 2009**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.